TERESA C. CHOW (SBN 237694)
*tchow@bakerlaw.com*
DYANNE J. CHO (SBN 306190)
*dcho@bakerlaw.com*
ALEXANDER VITRUK (SBN 315756)
*avitruk@bakerlaw.com*
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA  90025-0509
Telephone:     310.820.8800
Facsimile:     310.820.8859

*Attorneys for Defendant*
SAINT AGNES MEDICAL CENTER

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN DOE, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAINT AGNES MEDICAL CENTER,<br><br>Defendant. | Case No.:<br><br>[Fresno County Superior Court Case No.:  23CECG00816]<br><br>**DEFENDANT'S NOTICE OF REMOVAL**<br><br>Action Filed:      03/03/2023<br>Action Removed:   05/05/2023 |

<u>**NOTICE OF REMOVAL**</u>

Over the past two decades, the federal government has engaged in an extensive effort to build a nationwide health information technology infrastructure. This case challenges the legitimacy of actions SAINT AGNES MEDICAL CENTER ("Saint Agnes") has taken in connection with pursuing that directive. Saint Agnes therefore removes this case pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

In like circumstances, as explained *infra* at pp. 11-12, district courts have allowed removal under the federal officer removal statute. *See Doe I v. UPMC*, No. 2:20-cv-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020); *see also Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1

2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020). In support of removal, Saint Agnes provides the following "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a):

### JURISIDICTION

1.      Saint Agnes removes this case pursuant to the federal officer removal statute. 28 U.S.C. § 1442(a). That statute permits removal when the defendant is "the United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency therefore, in an office or individual capacity, for or relating to any act under color of such office …" *Id*. § 1442(a)(1).

2.      The United States Supreme Court has directed that the federal officer removal statute is to be broadly construed, and that defendants may remove under this statute when they are acting under color of federal office. *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). To do so, a defendant must show that (a) it is a "person" within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a "colorable federal defense." *Riggs v. Airbus Helicopters, Inc*., 939 F.3d 981, 986–87 (9th Cir. 2019) (quoting *Fidelitad, Inc. v. Insitu, Inc*., 904 F.3d 1095, 1099 (9th Cir. 2018)).

3.      Since at least 2004, the federal government – through executive order, legislation, and regulatory and sub-regulatory action – has directed and overseen a public-private initiative to develop a nationwide infrastructure for health information technology. It has incentivized and directed providers who participate in the Medicare and Medicaid programs (like Saint Agnes) to offer patients online access to their medical records, and to optimize patient engagement with their medical information. The federal government has also modeled the behavior it wants to see; it has created a portal for Medicare beneficiaries and worked with the same third-party services, with the same "source code," at issue in this case.

4.      Saint Agnes has dutifully assisted and followed the federal government's direction in this effort. In so doing, it has acted within the penumbra of federal action and office. Given this, and the Supreme Court's directive that the federal officer removal statute must be broadly

DEFENDANT'S NOTICE OF REMOVAL

construed, and because this suit challenges this federally-directed conduct, the requirements of the federal removal statute are satisfied.

## NATURE OF THE CASE

5.      Saint Agnes is a California nonprofit public benefit corporation with its principal place of business at 1303 E. Herndon Ave. Fresno, CA 93720.

6.      On March 3, 2023, Plaintiff John Doe filed a complaint against Saint Agnes, in the Superior Court of the State of California for the County of Fresno, Case No. 23CECG00816.

7.      Plaintiff served Saint Agnes with the Complaint, on or about April 6, 2023.

8.      Plaintiff's nine-count Complaint purports to challenge Saint Agnes' routine on-line practices as various invasions of privacy, including alleged violations of the (1) California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq*.; (2) Confidentiality of Medical Information Act § 56.10; and (3) Confidentiality of Medical Information Act § 56.101; (4) Confidentiality of Medical Information Act § 56.06; (5) California's Constitutional right to privacy; (6) Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502; (7) breach of implied in fact contract; (8) quasi-contract/restitution/unjust enrichment; (8) Cal. Bus. & Prof. Code. §§ 17200 *et. seq*.; and (9) Cal. Civil Code §1798.83. *See generally* Complaint.

9.      Saint Agnes operates a website, www.samc.com, that among other things, provides information to the public about Saint Agnes and allows patients to access their medical records through a MySaintAgnes patient portal.

10.     Plaintiff alleges he "has used the Saint Agnes Medical Center website and patient portal to search for doctors and medical treatment." Compl. ¶¶ 9, 14. Additionally, Plaintiff alleges his "use of the Saint Agnes Medical Center website entailed providing [his] sensitive medical information, such as conditions for which he was seeking treatment." *Id*. ¶ 10.

11.     The Meta Pixel is one of several "Business Tools" offered by Facebook[1] that "help drive and decode key performance metrics from visitor traffic to their websites." *Id*. ¶ 150. Plaintiff alleges that, the Meta Pixel, allegedly used on Saint Agnes' website, allegedly is a "snippet of code" that "tracks users' activities as users navigate through a website." *Id*. ¶ 111 (internal quotations and

---

[1] Facebook rebranded itself as Meta in 2021.

DEFENDANT'S NOTICE OF REMOVAL

citation omitted). Plaintiff further alleges that, the Meta Pixel, "can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website." *Id.* Similarly, Plaintiff alleges the Meta Pixel "also captures information such as what content a user views on a website or how far down a web page they scrolled." *Id.*

12.     Plaintiff also alleges the Meta Pixel is "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." *Id.* ¶ 128. (internal quotations and citation omitted). Further, "the Meta Pixel is an analytics tool that allows business to measure the effectiveness of their advertising by understanding the actions people take on their websites." *Id.*

13.     Plaintiff does not assert that Saint Agnes discloses names, social security numbers, diagnoses, birth dates or comparable information to third parties.

### *The Meaningful Use Program*

#### *President Bush Establishes the Position of National Health*
#### *Information Technology Coordinator*

14.     In 2004, President George W. Bush issued an Executive Order that established a National Health Information Technology Coordinator ("National Coordinator"). *See* Exec. Order 13335 (Apr. 27, 2004). The purpose of the Order was to spark a "nationwide implementation of interoperable health information technology in both the public and private health care sectors." *Id.*

15.     Through the Executive Order, President Bush further ordered the National Coordinator to "develop, maintain, and direct the implementation of a strategic plan to guide the nationwide implementation of interoperable health information technology in both the public and private health care sectors that will reduce medical errors, improve quality, and produce greater value for health care expenditures." *Id.*

#### *The National Coordinator Makes Access to Online Health*
#### *Care Records a National Priority*

16.     From the outset, one important piece of this federal health information technology mission was the ability for individuals to be able to access their health records online. *See TOMMY*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S NOTICE OF REMOVAL

G. THOMPSON & DAVID J. BRAILER, MD, PHD, The Decade of Health Information Technology: Delivering Consumer-centric and Information-rich Health Care, at pg. e (July 21, 2004).

17.    But years later, when the percentage of Americans accessing their health information online remained low, the National Coordinator reported in 2015: "To truly empower consumers and move the health care system to become more patient-centered, *the government will need to help change these dynamics*." (*Id.* (emphasis added).) *See also, e.g.,* Joan Neuner, MD, MPH, et al., *Meaningful Use and the Patient Portal: Patient enrollment, use and satisfaction with patient portals at a later-adopting center*, AM. J. MED. QUAL. (Mar. 2015), at pg. 1 ("only 28% of physicians reported having EHRs that allowed patient access to records. Despite this, the architects of the MU rules have set the high bar for patient EHR access and communication.").

*Congress Uses Financial Incentives to Ensure that Health Care Providers Make Their Health Care Records Available to Patients and their Caretakers Online*

18.    In 2009, Congress codified the Office of the National Coordinator in the Health Information Technology for Economic and Clinical Health Act of 2009. 123 Stat. 115, 247 (2009).[2] At that time, Congress allocated billions of dollars to CMS to "invest in the infrastructure necessary to allow for and promote the electronic exchange and use of health information for each individual in the United States consistent with the goals outlined in the strategic plan developed by the [National Coordinator]." *Id.*

19.    As with President Bush's Executive Order, Congress tasked the National Coordinator with a series of responsibilities under federal law, including to "update the Federal Health IT Strategic Plan (developed as of June 3, 2008) to include specific objectives, milestones, and metrics" with respect to each of the following: "(i) [t]he electronic exchange and use of health information and the enterprise integration of such information," as well as "(vii) [s]trategies to enhance the use of health information technology in improving the quality of health care." 42 U.S.C. § 300jj-11(3)(A) (Strategic plan).

---

[2] "There is established within the Department of Health and Human Services an Office of the National Coordinator for Health Information Technology." 42 U.S.C. § 300jj-11(a).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

20.     Congress further codified a series of incentive payments for the Department of Health and Human Services, in conjunction with the Centers for Medicare and Medicaid Services, to make to health care providers for their adoption of health information technology, including through the Medicare program. *See* 42 U.S.C. § 1395w-4(o) (Incentives for adoption and meaningful use of certified EHR technology); *see also* C. Stephen Redhead, *The Health Information Technology for Economic and Clinical Health (HITECH) Act*, at pg. 2 (CONG. RES. SERV. Apr. 27, 2009) (discussing various financial incentives).

21.     As the Congressional Research Service explained at the time: "Beginning in 2011, the legislation provides Medicare incentive payments to encourage doctors and hospitals to adopt and use certified EHRs. Those incentive payments are phased out over time and replaced by financial penalties for physicians and hospitals that are not using certified EHRs." *Id.*

*The National Coordinator Makes Online Access to Health Information a Key Component of the Meaningful Use Regulations*

22.     The following year, the Department of Health and Human Services adopted the Meaningful Use regulations. *See* DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES, *Medicare and Medicaid Programs; Electronic Health Record Incentive Program*, 75 Fed. Reg. 144, 44314 (Jul. 28, 2010). In introducing the final regulations the agencies stated as follows: "Certified EHR technology used in a meaningful way is one piece of a broader HIT infrastructure needed to reform the health care system and improve health care quality, efficiency, and patient safety." *Id.* at 44321.

23.     One central component of the meaningful use regulations was the ability for patients to access their health care records online. *See* 42 C.F.R. § 495.20(f)(12)(i)(B) ("Beginning in 2014, provide patients with the ability *to view online*, download, and transmit information about a hospital admission.") (emphasis added); *see also id.* at (ii)(B) (same); REBECCA MITCHELL COELIUS, *Get the facts regarding view, download and transmit 2014 requirements*, HealthITbuzz, The Latest on Health IT from the ONC, at pg. 1 (Jan. 31, 2014) ("All providers and hospitals attesting to Meaningful Use in 2014 will need to implement the [view, download, and transmit] VDT capabilities for their patients. Those in Stage 1 will attest for *access*, those in Stage 2 will attest for

DEFENDANT'S NOTICE OF REMOVAL

*use*. The term 'online access' used in the VDT measure definitions refers to all three capabilities – view, download and transmit.") (emphasis in original).

24.     The regulations required health care providers to attest to the National Coordinator and to the Centers for Medicare and Medicaid Services on their progress with respect to this criteria in particular. *See* 45 C.F.R. § 170.314(e)(1)(i) (requiring reporting on "Patient engagement" for "[v]iew, download, and transmit to 3d party"; "EHR technology must provide patients (and their authorized representatives) with an online means to view, download, and transmit to a 3d party the data specified below," including "[t]he Common [Meaningful Use] Data Set"); 45 C.F.R. § 170.102 (Definitions) (defining the term "Common [Meaningful Use] Data Set" to include "[s]moking status," "[m]edications," "[m]edication allergies," "[l]aboratory tests," "[l]aboratory value(s)/result(s)," "[v]ital signs," "[c]are plan field(s), including goals and instructions," and "[p]rocedures").

*The National Coordinator Directs Healthcare Providers to Make Patient Portals Available to their Patients Online*

25.     To meet these criteria, the federal government directed health care providers to make online patient portals available to their patients: "You will have better success meeting meaningful use requirements for stage 2 if you integrate a patient portal effectively into your practice operations." Nat'l Learning Consortium, *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use Requirements* (May 2013).

26.     The government told health care providers that they "should understand the elements of an effective portal program and apply them to the specific needs of your practice." *Id.* Recommended governmental actions included "1. Learn the benefits of patient portals for patients and providers. 2. Understand how a patient portal helps achieve meaningful use requirements. 3. Implement proactive, engaging portal features. 4. Implement the portal with a systematic process. 5. *Actively promote and facilitate portal use.*" *Id.*

27.     The National Coordinator subsequently issued a "Patient Engagement Playbook," which was described as "a tool for clinicians, health care practice staff, hospital administrators, and others who want to leverage health IT – particularly electronic health records (EHR) patient portals

DEFENDANT'S NOTICE OF REMOVAL

1    – to engage patients in their health and care." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH

2    INFORMATION TECHNOLOGY, *Patient Engagement Playbook* (last updated Apr. 17, 2019).

3         28.    The National Coordinator has also specified how providers can optimize such

4    portals, explaining that they "must be engaging and user-friendly"; "how a patient portal helps

5    achieve meaningful use requirements"; and how a provider can "actively promote and facilitate

6    portal use." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH INFORMATION TECHNOLOGY,

7    *How to Optimize Patient Portals for Patient Engagement and Meet Meaningful Use*

8    *Requirements* (2013), available at

9    https://www.healthit.gov/sites/default/files/nlc_how_to_optimizepatientportals_for_patientengage

10   ment.pdf.

11        29.    The National Coordinator has also published guidance for private providers to

12   follow, including through five-year strategic plans. In the 2015-2020 plan, it dictated that "federal

13   agencies" were to "<u>collaborate with</u> . . . private stakeholders to . . . build a culture of electronic

14   health information access and use." THE OFFICE OF THE NAT'L COORDINATOR FOR HEALTH

15   INFORMATION TECHNOLOGY, *Federal Health Information Technology Strategic Plan 2015-2020*,

16   available at https://www.healthit.gov/sites/default/files/9-5-federalhealthitstratplanfinal_0.pdf

17   (emphasis added). And, in the 2020-2025 plan, it noted that this has already happened, saying:

18   "Federal, state, and local governments, along with the private sector, have worked together to

19   help digitize health information and healthcare." THE OFFICE OF THE NAT'L COORDINATOR FOR

20   HEALTH INFORMATION TECHNOLOGY, *Federal Health Information Technology Strategic Plan*

21   *2020-2025* available at https://www.healthit.gov/sites/default/files/page/2020-

22   10/Federal%20Health%20IT%20Strategic%20Plan_2020_2025.pdf ("2020-2025 Strategic

23   Plan").

24        30.    In addition to this guidance, CMS has created its own portal, offering a model for

25   private providers to follow. To optimize individual engagement with the portal, CMS relies on

26   third-party marketers, like Google and Facebook. By working with over two dozen third-party

27   servicers, CMS is able to provide users with the information most relevant to them. *See generally*

28   Medicare.gov, Privacy Policy (explaining that website "users' activity on third-party websites that

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S NOTICE OF REMOVAL

Medicare.gov links to (like Facebook or Twitter) is governed by the security and privacy policies of those websites," and that any information users "provide to register on Facebook is voluntarily contributed and isn't maintained by" CMS.

*Saint Agnes Makes a Patient Portal and Electronic Health Information Exchange Available*

*Online to Saint Agnes Patients in Direct Furtherance of this Federal Mission*

31.     The MySaintAgnes patient portal and electronic Health Information Exchange ("HIE") are tools leveraged and promoted by Saint Agnes for its patients' use as a direct result of the federal initiative to make health care records available to patients online. Since leveraging the patient portal and electronic HIE, Saint Agnes has continually met the Meaningful Use criteria, and has thus received incentive payments from the federal government. If necessary, Saint Agnes is prepared to submit a declaration supporting its participation in the Meaningful Use program.

### *Saint Agnes Is A "Person"*

32.     By the plain terms of the statute, removal is permitted by "any person acting under that officer." 42 U.S.C. § 1442(a)(1).

33.     While the statute is silent as to the definition of a "person", organizations, corporate defendants, and government entities have routinely removed under this provision and been deemed a "person" under the statute. *See, e.g., Arness v. Boeing N. Am., Inc.,* 997 F. Supp. 1268, 1272 (C.D. Cal. 1998); *Fung v. Abex Corp.*, 816 F. Supp. 569, 572 (N.D. Cal. 1992); *Overly v. Raybestos-Manhattan*, No. C-96-2853-SI, 1996 U.S. Dist. LEXIS 13535, at *7 (N.D. Cal. Sept. 6, 1996); *Malek v. Blackmer Pump Co*., No. CV 15-04454 SJO (JEMx), 2015 U.S. Dist. LEXIS 97755, at *5 (C.D. Cal. July 24, 2015).

34.     Saint Agnes is a California nonprofit corporation and since the federal officer statute is to be broadly construed, Saint Agnes qualifies as a person under that statute.

### *There is a Causal Nexus Between Saint Agnes' Actions and Plaintiff's Claims*

35.     To demonstrate a causal nexus, the private person must show: (1) that the person was "acting under" a federal officer in performing some "act under color of federal office," and (2) that such action is causally connected with the plaintiff's claims against it. *See Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1244–50 (9th Cir. 2017). The federal

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

DEFENDANT'S NOTICE OF REMOVAL

officer removal statute should be "liberally construed" to fulfill its purpose of allowing federal officials and agents who are being prosecuted in state court for acts taken in their federal authority to remove the case to federal court. *Watson v. Philip Morris Cos*., 551 U.S. 142, 147–49, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007).

### *Saint Agnes is Acting Under a Federal Officer*

36.     This element focuses on the relationship between the federal government and the private entity. It asks whether the entity is engaged in "an effort to assist, or to help carry out, the duties or tasks of the federal superior," and whether the relationship between the government and private entity involves "detailed regulation, monitoring, or supervision." *Goncalves*, 865 F.3d at 1245 (citing to *Watson*, 551 U.S. at 152).

37.     Here these fundamental and liberally-construed requirements are easily met. The federal government is incentivizing, regulating, monitoring, and supervising Saint Agnes' actions in the Meaningful Use program in order to meet the federal government's national priority of interoperable health information technology.

38.     First, Saint Agnes (along with numerous other healthcare entities) is helping the government produce the nationwide, interoperable information technology infrastructure for health information. Notably, the federal government itself has repeatedly acknowledged the private sector's essential role in the project, most recently stating that "the federal government and private sector have worked together to help digitize health information and healthcare." *See* 2020-2025 Strategic Plan.

39.     Second, in the absence of Saint Agnes' actions (and the work of comparable medical providers throughout the country), the federal government would be left alone to complete its mission. As its efforts to digitize information and increase patient engagement with Medicare beneficiaries underscore, it would likely attempt to do exactly that.

40.     Third, the government has specified how to best enhance patient engagement, including through a patient portal. It has clarified how to generally design the portals, and has told entities how best to market their on-line resources. Furthermore, through its own engagement with third-party services, it has modeled the behavior that private entities are to follow.

Baker & Hostetler LLP
Attorneys at Law
Los Angeles

41.     Finally, the government has created an office dedicated to this issue and has closely monitored the work of private entities (like Saint Agnes). It has also supervised the general development of this information technology infrastructure. And, because Meaningful Use incentives have been available only to entities participating in the Medicare and Medicaid programs, CMS substantially incentivizes Saint Agnes and comparable organizations to not only maintain public websites and/or patient portals, but also to achieve meaningful use of them.

42.     In like circumstances, courts have liberally construed the "acting under" requirement, holding that defendant medical providers were "acting under" a federal officer while performing similar alleged conduct. *UPMC*, 2020 WL 4381675, at *6 (holding that the University of Pittsburgh Medical Center's participation in the Meaningful Use Program was sufficient to satisfy the "acting under" requirement necessary for the federal officer removal statute); *see also Doe v. ProMedica Health Sys., Inc.*, No. 3:20 CV 1581, 2020 WL 7705627, at **2-3 (N.D. Ohio Oct. 30, 2020) (same; "[b]ecause [ProMedica Health System's] participation assisted the federal government in achieving [the creation of a unified system of patient electronic health records], Defendant has satisfied the 'acting under' prong").

43.     In *UPMC*, as in this case, plaintiffs sought redress under state law for UPMC's alleged disclosure of Plaintiff's personally identifiable information to third parties for internet marketing purposes without their knowledge or authorization. *UPMC*, 2020 WL 4381675, at *1. The UPMC court focused on both the portal and the public website as being ways of furthering the government's goal of increasing patient engagement with electronic health records. *See, e.g.*, "UPMC, as a participant in the Meaningful Use Program, receives incentive payments from DHHS for its development and use of the UPMC website and the MyUPMC portal in accordance with the program's criteria." *Id*. at *6. The UPMC court also emphasized that "it is not necessary that the complained-of conduct be done at the specific behest of the federal superior," and "any dispute about whether the allegedly wrongful conduct was outside the scope the private entity's duties is the very thing that should be left to a federal court to decide." *Id*. at *7. A private entity "need only show that the allegations in the complaint are directed at the private entity's efforts to assist a federal superior." *Id*. at **9-10. That low bar is clearly met here. Here, as in *UPMC*, "[t]here is plainly a

DEFENDANT'S NOTICE OF REMOVAL

connection or association between [the medical provider's alleged] website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability. Plaintiff's claims are therefore 'for or relating to' an act under color of federal office." *Id.*

### *Plaintiff's Claims Relate to the Actions Under Color of Federal Office*

44.     Under Section 1442(a)(1), the conduct at issue in the case must also "have been undertaken for or relating to" the federal office. As the *UPMC* decision shows, this requirement is liberally construed and easily met here. *UPMC*, 2020 WL 4381675, at *12 ("There is plainly a connection or association between UPMC's website management and marketing strategies and the Meaningful Use program, particularly the incentives that are tied to patient participation and usability.").

45.     Plaintiff's Complaint directly challenges Saint Agnes' website analytics practices, which promote "meaningful use" by helping to drive patients to the Saint Agnes websites and to the patient portal.

46.     Plaintiff's Complaint also generally targets Saint Agnes' alleged tracking of online behaviors through source code and cookies, along with the use of marketing companies in conjunction with its public medical website. The Meaningful Use program envisions these activities, as manifested by the federal government's own use of these codes and third parties for its Medicare website.

47.     Indeed, as Plaintiff himself alleges, the entire point of using the third-party services is to direct traffic to, and increase engagement with, Saint Agnes' website. For example, he alleges that Meta Pixel "is a snippet of code" that "tracks users' activities as users navigate through a website." Compl. ¶ 111 (internal quotations and citation omitted). Likewise, he says that the "Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website." *Id.*

### *Saint Agnes Raises Colorable Federal Defenses to Plaintiff's Claims*

48.     The final requirement for removal under this statute erects a low bar and merely requires that the defendant's assertion is both "defensive" and "based in federal law." *Mesa v. Cal.*,

DEFENDANT'S NOTICE OF REMOVAL

489 U.S. 121, 129-30 (1989); *see also Bahrs v. Hughes Aircraft Co.*, 795 F. Supp. 965, 969 (D. Ariz. 1992) ("The question is not whether a defendant's claimed defense is meritorious, but only whether a colorable claim to such a defense has been made.").

49.     Defendant intends to assert several defenses, but by way of illustration and not limitation, there is at least one colorable federal defense to the claims at issue here that satisfy this requirement.

50.     In response to Plaintiff's repeated claims that "sensitive medical information" was disclosed, Saint Agnes will argue that the information purportedly disclosed (*i.e.*, IP addresses and other web metadata) is outside of the purview of protected health information as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). This is a duty-based defense that Saint Agnes had no duty under HIPAA. "In the federal officer removal context, a duty-based defense must be one that is based on a federal duty to act, or the lack of such a duty, such as denying alleged violations of a federal duty." *UPMC*, 2020 WL 4381675 at *6 (W.D. Pa. July 31, 2020) (citations and quotations omitted). The Northern District of California has already held in an analogous case against numerous health care providers challenging alleged disclosures on the Internet through routine website traffic that the information allegedly transmitted is not protected under HIPAA. *See Smith v. Facebook*, 262 F. Supp. 3d 943, 954-55 (N.D. Cal. 2017). This defense turns on an interpretation of federal law and on its own is sufficient to satisfy this element's low bar.

51.     Second, Saint Agnes will argue that federal preemption applies here. "A defense based on federal preemption of state law is also sufficient to raise a colorable federal defense for the purposes of the federal officer removal statute." *UPMC*, 2020 WL 4381675 at *7. In *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 343 (2001), the Supreme Court held that plaintiffs' state law fraud on the Food and Drug Administration claims brought against the defendant inevitably conflicted with the FDA's responsibility to police fraud consistently with the Agency's judgment and objections. The Supreme Court held that federal preemption is warranted where "the relationship between a federal agency and the entity it regulates is inherently federal in character." *Id.* at 347. As the *UPMC* court recognized under similar circumstances, "the relationship between

DEFENDANT'S NOTICE OF REMOVAL

[a health care provider] and DHHS is 'inherently federal' in nature, such that the issue of whether [Plaintiff's] state-law claims are preempted under the principles articulated in *Buckman* should be decided by a federal court." *UPMC*, 2020 WL 4381675 at *7.

52.     Because each of the requirements of the statute are satisfied, removal to this Court is proper.

## PROCEDURAL REQUIREMENTS FOR REMOVAL

53.     Saint Agnes satisfies all of the procedural requirements under 28 U.S.C. § 1446.

54.     Saint Agnes is filing this Notice of Removal within thirty (30) days of its receipt of the Complaint by "service," 28 U.S.C. § 1446.

55.     Saint Agnes files this Notice in the United States District Court of the Eastern District of California, because the State court in which the action is pending, the Superior Court of Fresno County, is within this federal judicial district. This Notice is signed pursuant to Federal Rules of Civil Procedure, Rule 11.

56.     Saint Agnes has attached hereto as **Exhibit "A"** is a true and correct copy of "all process, pleadings, orders, and other documents," currently on file in the state court, including Plaintiff's Complaint.

57.     Upon filing this notice, Saint Agnes will promptly "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the State court.

58.     Pursuant to Federal Rule of Civil Procedure 7.1, Saint Agnes is filing a Corporate Disclosure Statement concurrently with this Notice of Removal.

## CONCLUSION

59.     As set forth above, Plaintiff's Complaint directly challenges practices and procedures Saint Agnes has taken acting under color of federal law in implementing federal policy to nationalize the health information technology infrastructure. Plaintiff's Complaint is therefore appropriately removable to this Court pursuant to 28 U.S.C. § 1442(a)(1).

DEFENDANT'S NOTICE OF REMOVAL

Respectfully submitted,

Dated:  May 5, 2023

**BAKER & HOSTETLER LLP**

By:      */s/ Teresa C. Chow*
           TERESA C. CHOW

*Attorneys for Defendant*
SAINT AGNES MEDICAL CENTER

DEFENDANT'S NOTICE OF REMOVAL

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# EXHIBIT "A"

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
SAINT AGNES MEDICAL CENTER,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOHN DOE, individually and on behalf of others similarly situated,

E-FILED
3/10/2023 9:44 AM
Superior Court of California
County of Fresno
By: Marta Sanchez, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have **30 CALENDAR DAYS** after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Califorina Superior Court, Fresno County

B.F. Sisk Courthouse, 1130 O Street, Fresno, CA 93721-2220

**CASE NUMBER:**
*(Número del Caso):*
23CECG00816

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Michael A. Caddell, Caddell & Chapman, 628 East 9th St., Houston, TX 77007 (713) 751-0400

DATE: 3/10/23                                    Clerk, by _____M. Sanchez_____, Deputy
*(Fecha)*                                            *(Secretario)*                              *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Saint Agnes Medical Center

   under: ☒ CCP 416.10 (corporation)                    ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)            ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)     ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

1  Michael A. Caddell (SBN 249469)
   mac@caddellchapman.com
2  Cynthia B. Chapman (SBN 164471)
   cbc@caddellchapman.com
3  Amy E. Tabor (SBN 297660)
   aet@caddellchapman.com
4  CADDELL & CHAPMAN
   628 East 9th Street
5  Houston TX 77007-1722
   Tel.: (713) 751-0400
6  Fax: (713) 751-0906

7  Foster C. Johnson
   fjohnson@azalaw.com (SBN 289055)
8  David Warden (*pro hac vice forthcoming*)
   dwarden@azalaw.com
9  Joseph Ahmad (*pro hac vice forthcoming*)
   jahmad@azalaw.com
10 Nathan Campbell (*pro hac vice forthcoming*)
   ncampbell@azalaw.com
11 AHMAD, ZAVITSANOS, & MENSING, P.C.
   1221 McKinney Street, Suite 3460
12 Houston TX 77010
   Tel: (713) 655-1101
13 Fax: (713) 655-0062

14 *Attorneys for Plaintiff*

E-FILED
3/3/2023 2:12 PM
Superior Court of California
County of Fresno
By: I. Herrera, Deputy

15 **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

16 **COUNTY OF FRESNO**

17  JOHN DOE, individually and on
18  behalf of others similarly situated,

                *Plaintiff,*
19
        *v.*
20
    SAINT AGNES MEDICAL
21  CENTER,
22
                *Defendant.*
23

CASE NO. 23CECG00816

**CLASS ACTION COMPLAINT
AND DEMAND FOR JURY TRIAL**

24
25      Plaintiff John Doe ("Plaintiff"), individually and on behalf of all other current California
26  citizens similarly situated, brings suit against Defendant Saint Agnes Medical Center ("Defendant"
27  or "Saint Agnes Medical Center"), and upon personal knowledge as to Plaintiff's own conduct and
28

CASE NO.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**PAGE 18 EXHIBIT A (CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL)**

on information and belief as to all other matters based upon investigation by counsel, alleges as follows:

## I. SUMMARY OF ALLEGATIONS

1.      This case arises from Defendant's systematic violation of the medical privacy rights of patients and users of Defendant's services, exposing highly sensitive personal information to Facebook without those patients' or users' knowledge or consent.

2.      Defendant's "Notice of Privacy Practices" tells patients and prospective patients that Defendant "is committed to protecting medical information about you."[1]  Defendant also assures its patients that their "uses and disclosures of medical information for marketing purposes, and disclosures that constitute a sale of medical information, require your authorization."[2] Defendant further promises that any "uses and disclosures of medical information not covered by this notice or the laws that apply to us will be made only with your written permission."[3]  Contrary to these assurances, however, Defendant does not follow these policies, nor does it follow the law prohibiting such disclosures.

3.      Since at least 2017, Defendant has disclosed information about prospective and actual patients—including their status as actual or potential patients, their actual or potential physicians, their actual or potential medical treatments, the hospitals they visited or may visit, and their personal identities—to Facebook, Google, and other third parties without their prospective or actual patients' knowledge, authorization, or consent.

4.      Defendant disclosed this protected health information through the deployment of various digital marketing and automatic software tools embedded on websites that purposefully and intentionally disclose personal health information to Facebook, Google, and other third parties who exploit that information for advertising purposes. Defendant's use of these tools caused personally identifiable information and the contents of communications exchanged between

[1] https://www.samc.com/assets/documents/privacy-and-legal/samc-th-npp-2017-nodate.pdf

[2] https://www.samc.com/assets/documents/privacy-and-legal/samc-th-npp-2017-nodate.pdf

[3] https://www.samc.com/assets/documents/privacy-and-legal/samc-th-npp-2017-nodate.pdf

CASE NO.

1    actual and prospective patients with Defendant to be automatically redirected to Facebook,

2    Google, and other third parties in violation of those patients' reasonable expectations of privacy,

3    their rights as patients, their rights as citizens of California, and both the express and implied

4    promises of Defendant.

5          5.     Defendant's conduct in disclosing such protected health information to Facebook,

6    Google, and other third parties violates California law, including the California Invasion of

7    Privacy Act ("CIPA"), CAL. PENAL CODE §§ 630, et seq.; the California Confidentiality of

8    Medical Information Act ("CMIA"), CAL. CIVIL CODE §§ 56.06, 56.10, 56.101; the

9    Comprehensive Computer Data Access and Fraud Act ("CDAFA"), CAL. PENAL CODE § 502; and

10   Invasion of Privacy and Violation of the California Constitution, ART. 1, § 1.

11        6.     Plaintiff continues to desire to search for health information on Defendant's

12   websites. Plaintiff will continue to suffer harm if the websites are not redesigned. If the websites

13   were redesigned to comply with applicable laws, Plaintiff would use Defendant's websites to

14   search for health information in the future.

15        7.     On behalf of himself and all similarly situated current citizens of California,

16   Plaintiff seeks an order enjoining Defendant from further unauthorized disclosures of personal

17   information; awarding statutory damages in the amount of at least $5,000 per violation, attorney's

18   fees and costs; and granting any other preliminary or equitable relief the Court deems appropriate.

19                              **II. PARTIES**

20   **A. Plaintiff**

21        8.     Plaintiff John Doe is a resident of Fresno County, California.

22        9.     Plaintiff John Doe has used the Saint Agnes Medical Center website and patient

23   portal to search for doctors and medical treatment.

24       10.    Plaintiff John Doe's use of the Saint Agnes Medical Center website entailed

25   providing John Doe's sensitive medical information, such as conditions for which he was seeking

26   treatment.

27

28   CASE NO.

---

**B. Defendant**

11.     Defendant Saint Agnes Medical Center is a California corporation with its principal place of business located at 1303 E. Herndon Avenue, Fresno, California.  Saint Agnes Medical Center consists of multiple acute-care hospitals, health centers, urgent care centers, and specialty clinics.[4]  Defendant owns and operates multiple websites for patients, including https://www.samc.com/ and https://www.saintagnescare.com/.  Both websites are copyrighted to Saint Agnes Medical Center.

## II.  JURISDICTION AND VENUE

12.     This Court has jurisdiction over Defendant because it regularly conducts business throughout California, including in Fresno County, and has its principal place of business in California.

13.     Venue is appropriate in this Court because Fresno County is the county where Defendant resided at the commencement of this action.  *See* Cal. C.C.P. §§ 395(a).  Venue is also appropriate in this Court because the injuries giving rise to the alleged causes of action occurred in Fresno County and because Plaintiff John Doe resided in Fresno County at the time the offer of services for personal use was made by Defendant.  *See* Cal. C.C.P. §§ 395(a) & 395(b).  Venue is also appropriate in this Court because Fresno County is the county in which the cause, or some part of the cause, arose for the recovery of a penalty imposed by statute.  *See* Cal. C.C.P. § 393(a).

## III. FACTUAL BACKGROUND

14.     Plaintiff John Doe visited Defendant's website in 2022 at https://www.samc.com. He had concerns about an ear infection and was looking for primary care physicians who could provide ongoing care.  He entered data on Defendant's website, including sensitive medical information and details about his medical condition. He also searched for a doctor on Defendant's website to help provide an annual physical.

---

[4] https://www.samc.com/find-a-location/locations-results?LocationDescendants=true

CASE NO.

15.      Unbeknownst to Plaintiff John Doe, Defendant had embedded computer code on its website that took every search term he entered and every page of the site he visited and sent that information directly to Facebook, the largest and most profitable social media company on the planet. Saint Agnes Medical Center accomplished this by installing Facebook's "Meta Pixel" tool on almost every page of its website. The Meta Pixel worked like a listening device. Each time Plaintiff John Doe typed a search term, the Meta Pixel recorded the information he entered and transmitted it to Facebook, along with identifiable information that let Facebook know exactly who John Doe was.

16.      Facebook then took this information and added it to all of the other information it keeps about consumers, matching John Doe's interest in medical care with his Facebook profile, name, address, interests, and other websites he had visited. This information then became available for Facebook's advertisers to use when Facebook sold them targeted advertising services.

17.      Plaintiff was surprised and troubled that information he believed he was communicating only to Saint Anges Medical Center for the purpose of obtaining medical treatment had been sent to Facebook, Google, and other third parties.  Plaintiff subsequently learned that thousands of Defendant's patients had similarly had their privacy rights violated. Most of these patients were likely not even aware of this privacy violation, much less able to hire counsel to stop the illegal conduct. Plaintiff therefore now brings these claims to correct Saint Agnes Medical Center's privacy violations and obtain relief for himself and thousands of similarly situated patients.

## IV. CLASS ACTION ALLEGATIONS

**A. Defendant routinely disclosed the protected health information of patients and users of their services to Facebook.**

18.      Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending

CASE NO.

1   life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety,

2   happiness, and privacy." California Constitution, Article I, Section 1.

3        19.    Medical patients and those seeking medical treatment in California such as John

4   Doe have a legal interest in preserving the confidentiality of their communications with health

5   care providers and have reasonable expectations of privacy that their personally identifiable

6   information and communications will not be disclosed to third parties by Defendant without their

7   express written consent and authorization.

8        20.    As a health care provider, Defendant has common law and statutory duties to

9   protect the confidentiality of patient information and communications.

10       21.    Defendant expressly and impliedly promises patients that it will maintain and

11  protect the confidentiality of personally identifiable patient information and communications.

12       22.    Defendant operates websites for current and prospective patients, including

13  https://www.samc.com.

14       23.    Defendant's websites are designed for interactive communication with patients,

15  including scheduling appointments, searching for physicians, paying bills, requesting medical

16  records, learning about medical issues and treatment options, and joining support groups.

17       24.    Defendant encourages patients to use digital tools on its websites to seek and

18  receive health care services.

19       25.    The home page of Defendant's website is designed for use by patients.   The

20  homepage provides patients with tools to seek medical treatment, such as finding a doctor,

21  researching services and treatments, and paying bills.

22       26.    Defendant also maintains a patient portal, which allows patients to make

23  appointments, access medical records, view lab results, and exchange communications with health

24  care providers.   Source code on Defendant's website causes these communications to be

25  intercepted and disclosed to multiple third parties, including Google.

26

27

28  CASE NO.

---

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**PAGE 23 EXHIBIT A (CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL)**

27.     Defendant encourages patients to use digital tools on its websites to seek and receive health care services.  Plaintiff and Class Members provided their private information to Defendant's website with the reasonable understanding that Defendant would secure and preserve the confidentiality of that information.

28.     Plaintiff and Class Members exchanged numerous communications with Defendant.  Plaintiff's and Class Members' communications included logging in and out of patient portals, exchanging communications about doctors and health conditions, and using button functionality from defendant's websites.

29.     Notwithstanding prospective and current patients' reasonable expectations of privacy, Defendant's legal duties of confidentiality, and Defendant's express promises to the contrary, Defendant disclosed (and continues to disclose) the contents of Plaintiff's and Class Members' communications and protected healthcare information via automatic mechanisms embedded in the websites operated by Defendant without patients' knowledge, authorization, or consent.  In doing so, Defendant systematically violated the medical privacy rights of Plaintiff and Class Members by causing the unauthorized disclosure of their communications to be transmitted to Facebook, Google, and other third-party marketing companies.

30.     The private information provided by Plaintiff and Class Members has been—and likely will be—further disseminated to additional third parties.

31.     While Defendant intentionally incorporated the Meta Pixel into its website, Defendant never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications with Facebook.  As a result, Plaintiff and Class Members were unaware that their private information was being surreptitiously transmitted to Facebook when they visited Defendant's website.

32.     By design, none of the tracking mechanisms employed by Defendant are visible to patients visiting Defendant's website.

CASE NO.

33.     Defendant did not warn or otherwise disclose to Plaintiff and Class Members that Defendant bartered their confidential medical communications to Facebook, Google, and other third parties for marketing purposes.

34.     Plaintiff and Class Members never consented, agreed, or otherwise authorized Defendant to disclose their confidential medical communications, particularly not beyond the limits of Defendant's express promises to protect the confidentiality of Plaintiff's and Class Members' private information.

35.     Upon information and belief, Defendant intercepted and disclosed the following non-public private information to Facebook:

    a.   Plaintiff's and Class Members' status as patients;

    b.   Plaintiff's and Class Members' communications with Defendant via its website;

    c.   Plaintiff's and Class Members' use of Defendant's patient portal;

    d.   Plaintiff's and Class Members' searches for information regarding specific medical conditions and treatments, their medical providers, and their physical location.

36.     Defendant interfered with Plaintiff's and Class Members' privacy rights when it implemented technology that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential information to Facebook, Google, and other third parties.

37.     Defendant also breached its obligations to patients in multiple other ways, including (1) failing to obtain their consent to disclose their private information to Facebook and other third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its website was safe and secure, (3) failing to remove or disengage software code that was known and designed to share patients' private information with third parties, (4) failing to take steps to block the transmission of Plaintiff's and Class Members' private information to Facebook and other third-party advertising companies, (5) failing to warn Plaintiff and Class Members that Defendant was routinely bartering their private information to Facebook

CASE NO.

1  via the Meta Pixel, and (6) otherwise ignoring Defendant's common-law and statutory obligations

2  to protect the confidentiality of patient's protected health information.

3         38.    Plaintiff and Class Members have suffered injury because of Defendant's conduct.

4  Their injuries include invasion of privacy and the continued and ongoing risk of irreparable harm

5  from the disclosure of their most sensitive and personal information.

6  **B.  The nature of Defendant's unauthorized disclosure of patients' health care information.**

7         39.    Defendant's disclosure of current and prospective patients' personal healthcare

8  information occurs because Defendant intentionally deploys source code on the websites it

9  operates, which causes current and prospective patients' personally identifiable information (as

10  well as the exact contents of their communications) to be transmitted to third parties.

11         40.    By design, third parties receive and record the exact contents of these

12  communications before the full response from Defendant has been rendered on the screen of the

13  patient's or user's computer device and while the communication with Defendant remains

14  ongoing.

15         41.    For example, when Plaintiff or a Class Member accessed Defendant's website

16  pages hosting the Meta Pixel, the Meta Pixel software directed their browsers to send a message

17  to Facebook's servers.  The information that Defendant sent to Facebook included the private

18  information that Plaintiff and Class Members communicated to Defendant's website, such as the

19  type of medical appointment the patient made, the date, and the specific doctor the patient was

20  seeing.  Such private information allows third-party advertising companies like Facebook to

21  determine that a specific patient was seeking a specific type of confidential medical treatment.

22  This kind of disclosure also allows Facebook to reasonably infer that a specific patient was being

23  treated for specific types of medical conditions, such as cancer.

24         42.    Websites like those maintained by Defendant are hosted by a computer server

25  through which the businesses in charge of the website exchange and communicate with internet

26  users via their web browsers.

27

28  CASE NO.

43.     Every website is hosted by a computer server through which the entity in charge of the website exchanges communications with internet users via a client device, such as a computer, tablet, or smart phone, via the client device's web browser.

44.     Web browsers are software applications that allow users to exchange electronic communications over the internet.

45.     Each exchange of an electronic communication over the internet consists of an HTTP request from a client device and an HTTP response from a server.  When a user types a URL into a web browser, for example, the URL is sent as an HTTP request to the server corresponding to the web address, and the server then returns an HTTP response that consists of a web page to render in the client device's web browser.

46.     In addition to specifying the URL, HTTP requests can also send data to the host server, including users' cookies.  Cookies are text files stored on client devices to record data, often containing sensitive, personally identifiable information.

47.     In turn, HTTP responses may consist, among other things, of a web page, another kind of file, text information, or error codes.

48.     A web page consists primarily of "Markup" and "Source Code."  The markup of a web page comprises the visible portion of that web page.  Markup is displayed by a web browser in the form of words, paragraphs, images, and videos displayed on a users' device screen.  The source code of a web page is a set of instructions that commands the browser to take certain actions, either when the web page loads or when a specified event triggers the code.

49.     For example, typing https://www.samc.com/ into a web browser sends an http request to Defendant's website, which returns a HTTP response in the form of the home page of Defendant's website:

CASE NO.

1
2
3
4
5
6
7
8
9
10
11
12



13   50.      Source code is not visible on the client device's screen, but it may change the

14   markup of a webpage, thereby changing what is displayed on the client device's screen.  Source

15   code may also execute a host of other programmatic instructions, including commanding a web

16   browser to send data transmissions in the form of HTTP requests to the website's server, or, as is

17   the case with Defendant's website, to third parties via pixels.

18   51.      For example, Defendant's website includes software code that transmits HTTP

19   requests *directly* to Facebook, including patients' private health information, every time a patient

20   interacts with a page on its website.

21   52.      The basic command that web browsers use to exchange data and user

22   communications is called a GET request.[5] For example, when a patient types "heart failure

23   treatment" into the search box on Defendant's website and hits 'Enter,' the patient's web browser

24   makes a connection with the server for Defendant's website and sends the following request:

25   "GET search/q=heart+failure+treatment."

26

27   [5] https://www.w3schools.com/tags/ref_httpmethods.asp

28   CASE NO.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**PAGE 28 EXHIBIT A (CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL)**

53.     The other basic transmission command utilized by web browsers is POST, which is typically employed when a user enters data into a form on a website and clicks 'Enter' or some other form of submission button. POST sends the data entered in the form to the server hosting the website that the user is visiting.

54.     In response to receiving a GET or POST command, the server for the website with which the user is exchanging information will send a set of instructions to the web browser and command the browser with source code that directs the browser to render the website's responsive communication.

55.     Unbeknownst to most users, however, the website's server may also transmit the user's communications to third parties. Indeed, Google warns website developers and publishers that installing its ad tracking software on webpages employing GET requests will result in users' personally identifiable information being disclosed to Google.[6]

56.     Third parties (such as Facebook and Google) use the information they receive to track user data and communications for marketing purposes.

57.     In many cases, third-party marketing companies acquire the content of user communications through a 1x1 pixel (the smallest dot on a user's screen) called a tracking pixel, a web-bug, or a web beacon. These tracking pixels are tiny and are purposefully camouflaged to remain invisible to users.

58.     Tracking pixels can be placed directly on a web page by a developer, or they can be funneled through a "tag manager" service to make the invisible tracking run more smoothly. A tag manager further obscures the third parties to whom user data is transmitted.

59.     These tracking pixels can collect dozens of data points about individual website users who interact with a website. One of the world's most prevalent tracking pixels, called the Meta Pixel, is provided by Facebook.

---

[6] https://support.google.com/platformspolicy/answer/6156630?hl=en

CASE NO.

60.     A web site developer who chooses to deploy third-party source code, like a tracking pixel, on their website must include the third-party source code directly in their website for every third party they wish to send user data and communications. This source code operates invisibly in the background when users visit a site employing such code.

61.     More significantly, tracking pixels such as the Meta Pixel tool allow Defendant and Facebook to secretly track, intercept, record, and transmit every patient communication made on Defendant's website.  When patients visit Defendant's website, unbeknownst to them, the web page displayed on the patient's browser includes the Meta Pixel as embedded code, which is not visible to patients or other visitors to Defendant's website.  This code is triggered when a patient or visitor interacts with the web page.  Each time the Meta Pixel is triggered, the software code is executed and sends patient's private information directly to Facebook.

62.     The Meta Pixel and similar tracking pixels act like a physical wiretap on a phone. Like a physical wiretap, pixels do not appear to alter the function of the communication device on which they are surreptitiously installed.  Instead, these pixels lie in wait until they are triggered by an event, at which time they effectively open a channel through the website funnels data about users and their actions to third parties via a hidden HTTP request that is never shown to or agreed to by the user.

63.     For example, a patient can trigger an HTTP request by interacting with the search bar on Defendant's website by typing a term such as "pregnancy" into the search bar and then hitting enter.  Defendant's server in turn sends an HTTP response, which results in the search results being displayed.

64.     This is not the only HTTP request, however, that is created by a patient's interaction with Defendant's website.  In fact, at the very same time the web page is instructed to send an HTTP request to Defendant requesting search results, the source code, acting as a tap, is triggered, such that Defendant's website is also instructed to send an HTTP request directly to

Facebook, Google, and other third parties, informing them of the patient's exact search and the patient's identifiable information.

**C.  Tracking pixels provide third parties with a trove of personally identifiable information.**

65.     Tracking pixels are especially pernicious because they result in the disclosure of personally identifiable information.

66.     For example, an IP address is a number that identifies a computer connected to the internet. IP addresses are used to identify and route communications on the internet. IP addresses of individual users are used by internet service providers, websites, and tracking companies to facilitate and track internet communications and content. IP addresses also offer advertising companies like Facebook a unique and semi-persistent identifier across devices—one that has limited privacy controls.[7]

67.     Because of their uniquely identifying character, IP addresses are considered protected personally identifiable information. 45 CFR § 164.514.  Tracking pixels can (and typically do) collect website visitors' IP addresses.

68.     Likewise, internet cookies also provide personally identifiable information.

69.     In the early years of the internet, advertising on websites followed the same model as traditional newspapers.  Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early internet paid for ads to be placed on specific web pages based on the type of content displayed.

70.     Computer programmers eventually developed 'cookies'—small text files that web servers can place on a user's browser and computer when a user's browser interacts with a website server.  Eventually some cookies were designed to acquire and record an individual internet user's communications and activities on websites across the internet.

71.     Cookies are designed to operate as a means of identification for internet users. Advertising companies like Facebook and Google have developed methods for monetizing and

---

[7] https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/

CASE NO.

profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell targeted advertising that is customized to a user's personal communications and browsing history.  To build individual profiles of internet users, third party advertising companies assign a unique (or a set of unique) identifiers to each user.

72.     Cookies are considered personal identifiers.  45 CFR § 164.514.  Tracking pixels can collect cookies from website visitors.

73.     In general, cookies are categorized by (1) duration and (2) party.

74.     There are two types of cookies classified by duration.

75.     "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie.  The user's web browser typically deletes session cookies when the user closes the browser.

76.     "Persistent cookies" are designed to survive beyond a single internet-browsing session.  The party creating the persistent cookie determines its lifespan.  As a result, a persistent cookie can acquire and record a user's internet communications for years and over dozens or even hundreds of websites.  Persistent cookies are also called "tracking cookies."

77.     Cookies are also classified by the party that uses the collected data.

78.     "First-party cookies" are set on a user's device by the website with which the user is exchanging communications.  First-party cookies can be helpful to the user, server, and/or website to assist with security, login, and functionality.

79.     "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications.  For example, the same patient who visits Defendant's website will also have cookies on their device from third parties, such as Facebook and Google.  Unlike first-party cookies, third-party cookies are not typically helpful to the user.  Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

80.     Data companies like Facebook have developed methods for monetizing and profiting from cookies.  These companies use third-party tracking cookies to help them acquire and record user data and communications in order to sell advertising that is customized to a user's communications and habits.  To build individual profiles of internet users, third party data companies assign each user a unique identifier or set of unique identifiers.

81.     Traditionally, first-party and third-party cookies were kept separate.  An internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server.  For example, although Defendant can deploy source code that uses Facebook third-party cookies to help Facebook acquire and record a patient's communications, Defendant is not permitted direct access to Facebook third-party cookie values.  The reverse *was* also true:  Facebook was not provided direct access to the values associated with first-party cookies set by companies like Defendant.  But Data companies have designed a way to hack around the same-origin policy so that third-party data companies like Facebook can gain access to first-party cookies.

82.     JavaScript source code developed by third party data companies and placed on a webpage by a developer such as Defendant can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company.  This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user.  Once the cookie synching operation is completed, the two websites can exchange any information that they have collected and recorded about a user that is associated with a cookie identifier number.  The technique can also be used to track an individual who has chosen to deploy third-party cookie blockers.

83.     In effect, cookie synching is a method through which Facebook, Google, and other third-party marketing companies set and access third-party cookies that masquerade as first-party cookies.  By designing these special third-party cookies that are set for first-party websites,

Facebook and Google hack their way around any cookie blockers that users set up to stop their tracking.

84.    The Facebook cookie used for cookie synching is named _fbp.

85.    On information and belief, the letters fbp are an acronym for Facebook Pixel.

86.    The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with the health care provider using the Meta Pixel.

87.    The _fbp cookie is also a third-party cookie in that it is also a cookie associated with Facebook that is used by Facebook to associate information about a person and their communications with non-Facebook entities while the person is on a non-Facebook website or app.

88.    Defendant requires patients using its patient portal to have enabled first-party cookies to gain access to its patient portal.

89.    The _fbp cookie is used as a unique identifier for patients by Facebook.

90.    If a patient takes an action to delete or clear third-party cookies from their device, the _fbp cookie is not impacted—even though it is a Facebook cookie—because Facebook has disguised it as a first-party cookie.  Facebook also uses IP addresses and user-agent information to match the health information it receives from Defendant with Facebook users.

91.    Defendant engages in cookie synching with Facebook, Google, and other third parties.

92.    Defendant' cookie disclosures include the deployment of cookie synching techniques that cause the disclosure of the first-party cookie values that Defendant assigns to patients to also be made to third parties.

93.    Defendant uses and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

94.     A third type of personally identifiable information is what data companies refer to as a "browser-fingerprint."  A browser-fingerprint is information collected about a computing device that can be used to identify the specific device.

95.     These browser-fingerprints can be used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.  As Google explained, "With fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[8] The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[9]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.[10]

96.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[11]

97.     Browser-fingerprints are personal identifiers, and tracking pixels can collect browser-fingerprints from website visitors.

98.     Defendant uses and causes the disclosure of data sufficient for third parties to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

99.     A fourth kind of personally identifiable information protected by law against disclosure are unique user identifiers (such as Facebook's "Facebook ID") that permit companies like Facebook to quickly and automatically identify the personal identity of its user across the

---

[8] https://www.blog.google/products/chrome/building-a-more-private-web/

[9] https://pixelprivacy.com/resources/browser-fingerprinting/

[10] https://www.blog.google/products/chrome/building-a-more-private-web/

[11] https://www.ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

CASE NO.

internet whenever the identifier is encountered.  A Facebook ID is an identifying number string that is connected to a user's Facebook profile.[12]  Anyone with access to a user's Facebook ID can locate a user's Facebook profile.[13]

100.  Unique identifiers such as a person's Facebook ID are likewise capable of collection through pixel trackers.

101.  Each of the individual data elements described above is personally identifiable on its own.  However, Defendant's disclosures of such personally identifiable data elements do not occur in a vacuum.  The disclosures of the different data elements are tied together and, when taken together, these data elements are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Facebook, Google, and other internet marketing companies that expressly state that they use such data elements to identify individuals.

**D.  Facebook's Business Model:  Exploiting Users' Personal Information for Profit**

102.  Facebook, a social media platform founded in 2004 and today operated by Meta Platforms, Inc., was originally designed as a social networking website for college students.

103.  Facebook describes itself as a "real identity" platform.[14] This means that users are permitted only one account and must share "the name they go by in everyday life."[15] To that end, Facebook requires users to provide their first and last name, along with their birthday, telephone number and/or email address, and gender, when creating an account.[16]

104.  In 2007, realizing the value of having direct access to millions of consumers, Facebook began monetizing its platform by launching "Facebook Ads," proclaiming this service to be a "completely new way of advertising online," that would allow "advertisers to deliver more

---

[12] https://www.facebook.com/help/211813265517027

[13] https://smallseotools.com/find-facebook-id/

[14] https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701#:~:text=Facebook%20said%20in%20its%20most,of%20them%20than%20developed%20ones.

[15] https://transparency.fb.com/policies/community-standards/account-integrity-and-authentic-identity/

[16] https://www.facebook.com/help/406644739431633

CASE NO.

tailored and relevant ads."[17] Facebook has since evolved into one of the largest advertising companies in the world.[18] Facebook can target users so effectively because it surveils user activity both on and off its website through the use of tracking pixels.[19] This allows Facebook to make inferences about users based on their interests, behavior, and connections.[20]

105.    Today, Facebook provides advertising on its own social media platforms, as well as other websites through its Facebook Audience Network. Facebook has more than 2.9 billion users.[21]

106.    Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications. These profiles are associated with personal identifiers, including IP addresses, cookies, and other device identifiers. Facebook also tracks non-users across the web through its internet marketing products and source code.

107.    Facebook offers several advertising options based on the type of audience that an advertiser wants to target. Those options include targeting "Core Audiences," "Custom Audiences," "Look Alike Audiences," and even more granulated approaches within audiences called "Detailed Targeting." Each of Facebook's advertising tools allows an advertiser to target users based, among other things, on their personal data, including geographic location, demographics (e.g., age, gender, education, job title, etc.), interests, (e.g., preferred food, movies), connections (e.g., particular events or Facebook pages), and behaviors (e.g., purchases, device usage, and pages visited). This audience can be created by Facebook, the advertiser, or both working in conjunction.

108.    Ad Targeting has been extremely successful due to Facebook's ability to target individuals at a granular level. For example, among many possible target audiences, "Facebook

---

[17] https://about.fb.com/news/2007/11/facebook-unveils-facebook-ads/

[18] https://www.pewresearch.org/fact-tank/2021/06/01/facts-about-americans-and-facebook/

[19] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[20] https://www.facebook.com/business/ads/ad-targeting

[21] https://www.statista.com/statistics/264810/number-of-monthly-active-facebook-users-worldwide/

CASE NO.

offers advertisers 1.5 million people 'whose activity on Facebook suggests that they're more likely engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'"[22] Aided by highly granular data used to target specific users, Facebook's advertising segment quickly became Facebook's most successful business unit, with millions of companies and individuals utilizing Facebook's advertising services.

**E. Facebook's Meta Pixel tool allows Facebook to track the personal data of individuals across a broad range of third-party websites.**

109.    To power its advertising business, Facebook uses a variety of tracking tools to collect data about individuals, which it can then share with advertisers. These tools include software development kits incorporated into third-party applications, its "Like" and "Share" buttons (known as "social plug-ins"), and other methodologies, which it then uses to power its advertising business.

110.    One of Facebook's most powerful tools is called the "Meta Pixel."

111.    The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activities as users navigate through a website.[23] Once activated, the Meta Pixel "tracks the people and type of actions they take."[24] Meta Pixel can track and log each page a user visits, what buttons they click, as well as specific information that users input into a website.[25] The Meta Pixel code works by sending Facebook a detailed log of a user's interaction with a website such as clicking on a product or running a search via a query box. The Meta Pixel also captures information such as what content a user views on a website or how far down a web page they scrolled.[26]

112.    When a patient uses their healthcare provider's website or application where the Meta Pixel is present, the Meta Pixel transmits the content of their communications to Facebook,

---

[22] https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html

[23] https://developers.facebook.com/docs/meta-pixel/

[24] https://www.facebook.com/business/goals/retargeting

[25] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[26] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

CASE NO.

including but not limited to (1) signing up for a patient portal, (2) signing-in and -out of a patient portal, (3) taking actions inside a patient portal, (4) making or scheduling appointments, (5) exchanging communications related to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions, (6) conduct a search on a Facebook partner website, and (7) other information that qualifies as personal health information under state and federal laws.

113.    In many circumstances, Facebook also obtains information from health care providers that identify a Facebook user's status as a patient and other health information that is protected by state and federal law.  This occurs through tools that Facebook encourages health care providers to use to upload customer (i.e., patient) lists for use in its advertising systems.

114.    The information transmitted from a health care provider's website or application is sufficient to uniquely identify a patient under federal law (such as IP addresses and device identifiers that Facebook associates with a patient's Facebook account), and may also include a patient's demographic information, email address, phone number, computer IP address, contact information, appointment type and date, treating physicians, button and menu selections, the content of buttons clicked, information typed into text boxes, and information about the substance, purport, and meaning of patient requests for information from their health care providers.

115.    When someone visits a third-party website page that includes the Meta Pixel code, the Meta Pixel code is able to replicate and send the user data to Facebook through a separate (but simultaneous) channel in a manner that is undetectable by the user.[27]  This information is disclosed to Facebook regardless of whether a user is logged into their Facebook account at the time.

116.    The transmission is instantaneous—indeed Facebook often receives the information before the health care provider does.

117.    The transmission is invisible.

---

[27] *See, e.g., In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589, 596 (9th Cir. 2020) (explaining functionality of Facebook software code on third-party websites).

CASE NO.

118.    The transmission is made without any affirmative action taken by the patient.

119.    The transmission occurs without any notice to the patient that it is occurring.

120.    Facebook collects the transmitted identifiable health information and uses "cookies" to match it to Facebook users, allowing Facebook to target ads to a person who, for example, has used a patient portal and has exchanged communications about a specific condition, such as cancer.

121.    The information Meta Pixel captures and discloses to Facebook includes a referrer header (or "URL"), which includes significant information regarding the user's browsing history, including the identifiable information of the individual internet user and the web server, as well as the name of the web page and the search terms used to find it.[28]  When users enter a URL address into their web browser using the 'http' web address format, or click hyperlinks embedded on a web page, they are actually telling their web browsers (the client) which resources to request and where to find them.  Thus, the URL provides significant information regarding a user's browsing history, including identifiable information for the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it.

122.    These search terms and the resulting URLs divulge a user's personal interests, queries, and habits on third-party websites operating outside of Facebook's own platform.  In this manner, Facebook tracks users browsing histories on third-party websites and compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue.[29]

123.    For example, if Meta Pixel is incorporated on a shopping website, it may log what searches a user performed, which items of clothing a user clicked on, whether they added an item to their cart, as well as what they purchased. Along with this data, Facebook also receives personally identifiable information like IP addresses, Facebook IDs, user agent information, device identifiers, and other data. All this personally identifiable data is available each time the

---

[28] *In re Facebook*, 956 F.3d at 596.

[29] *In re Facebook*, 956 F.3d at 596.

CASE NO.

Meta Pixel forwards a user's interactions with a third-party website to Facebook's servers. Once Facebook receives this information, Facebook processes it, analyzes it, and assimilates it into datasets like its Core Audiences and Custom Audiences. Facebook can then sell this information to companies who wish to display advertising for products similar to what the user looked at on the original shopping website.

124.    These communications with Facebook happen silently, without users' knowledge. By default, the transmission of information to Facebook's servers is invisible.  Facebook's Meta Pixel allows third-party websites to capture and send personal information a user provides to match them with Facebook or Instagram profiles, even if they are not logged into Facebook at the time.[30]

125.    In exchange for installing its Meta Pixel, Facebook provides website owners like Defendant with analytics about the ads they have placed on Facebook and Instagram and tools to target people who have visited their website.[31]

126.    The Meta Pixel collects data on website visitors regardless of whether they have Facebook or Instagram accounts.[32]

127.    Facebook can then share analytic metrics with the website host, while at the same time sharing the information it collects with third-party advertisers who can then target users based on the information collected and shared by Facebook.

128.    Facebook touted Meta Pixel (which it originally called "Facebook Pixel") as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website."[33]  According to Facebook, the Meta Pixel is an analytics tool that allows

---

[30] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[31] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

[32] https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector

[33] https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/

CASE NO.

business to measure the effectiveness of their advertising by understanding the actions people take on their websites."[34]

129.    Facebook warns web developers that its Pixel enables Facebook "to match your website visitors to their respective Facebook User accounts."[35]

130.    Facebook recommends that its Meta Pixel code be added to the base code on every website page (including the website's persistent header) to reduce the chance of browsers or code from blocking Pixel's execution and to ensure that visitors will be tracked.[36]

131.    Once Meta Pixel is installed on a business's website, the Meta Pixel tracks users as they navigate through the website and logs which pages are visited, which buttons are clicked, the specific information entered in forms (including personal information), as well as "optional values" set by the business website.[37]   Facebook builds user profiles on users that include the user's real name, address, location, email addresses, friends, likes, and communications that Facebook associates with personal identifiers, such as IP addresses and the Facebook ID.  Meta Pixel tracks this data regardless of whether a user is logged into Facebook.

132.    Facebook tracks non-Facebook users through its widespread internet marketing products and source code, and Mark Zuckerberg has conceded that the company maintains "shadow profiles" on nonusers of Facebook.[38]

133.    For Facebook, the Meta Pixel tool embedded on third-party websites acts as a conduit for information, sending the information it collects to Facebook through scripts running in a user's internet browser, similar to how a "bug" or wiretap can capture audio information.  The information is sent in data packets, which include personally identifiable data.

---

[34] https://www.oviond.com/understanding-the-facebook-pixel

[35] https://developers.facebook.com/docs/meta-pixel/get-started

[36] https://developers.facebook.com/docs/meta-pixel/get-started

[37] https://developers.facebook.com/docs/meta-pixel/

[38] https://techcrunch.com/2018/04/11/facebook-shadow-profiles-hearing-lujan-zuckerberg/

CASE NO.

134.    For example, the Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific data."[39]   HTTP headers collect data including "IP addresses, information about the web browser, page location, document, referrer and person using the website."[40]  Pixel-specific data includes such data as the "Pixel ID and the Facebook Cookie."[41]

135.    Meta Pixel takes the information it harvests and sends it to Facebook with personally identifiable information, such as a user's IP address, name, email, phone number, and specific Facebook ID.  Anyone who has access to this Facebook ID can use this identifier to quickly and easily locate, access, and view a user's corresponding Facebook profile.  Facebook stores this information on its servers, and, in some instances, maintains this information for years.[42]

136.    Facebook has a number of ways to exploit the data that is being forwarded from third-party websites through the Meta Pixel.

137.    If a user has a Facebook account, the user data may be collected and linked to the individual user's Facebook account.  For example, if the user is logged into their Facebook account when the user visits a third-party website where the Meta Pixel is installed, many common browsers will attach third-party cookies allowing Facebook to link the data collected by Meta Pixel to the specific Facebook user.

138.    Alternatively, Facebook can link the data to a user's Facebook account through the "Facebook Cookie."[43]   The Facebook Cookie is a workaround to recent cookie-blocking applications used to prevent websites from tracking users.[44]

---

[39] https://developers.facebook.com/docs/meta-pixel/

[40] https://developers.facebook.com/docs/meta-pixel/

[41] https://developers.facebook.com/docs/meta-pixel/

[42] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

[43] https://clearcode.cc/blog/facebook-first-party-cookie-adtech/

[44] https://clearcode.cc/blog/difference-between-first-party-third-party-cookies/

CASE NO.

139.    Facebook can also link user data to Facebook accounts through identifying information collected through Meta Pixel through what Facebook calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching.[45]  Manual matching requires the website developer to manually send data to Facebook so that users can be linked to data.  Automatic matching allows Meta Pixel to scour the data it receives from third-party websites to search for recognizable fields, including names and email addresses that correspond with users' Facebook accounts.

140.    While the Meta Pixel tool "hashes" personal data—obscuring it through a form of cryptography before sending the data to Facebook—that hashing does not prevent *Facebook* from using the data.[46]  In fact, Facebook explicitly uses the hashed information it gathers to link pixel data to Facebook profiles.[47]

141.    Facebook also receives personally identifiable information in the form of user's unique IP addresses that stay the same as users visit multiple websites.  When browsing a third-party website that has embedded Facebook code, a user's IP address is forwarded to Facebook by GET requests, which are triggered by Facebook code snippets.  The IP address enables Facebook to keep track of the website page visits associated with that address.

142.    Facebook also places cookies on visitors' computers.  It then uses these cookies to store information about each user.  For example, the "c_user" cookie is a unique identifier that identifies a Facebook user's ID.  The c_user cookie value is the Facebook equivalent of a user identification number.  Each Facebook user has one—and only one—unique c_user cookie.  Facebook uses the c_user cookie to record user activities and communications.

143.    The data supplied by the c_user cookie allows Facebook to identify the Facebook account associated with the cookie.  One simply needs to log into Facebook and then type

---

[45] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[46] https://www.facebook.com/business/help/611774685654668?id=1205376682832142

[47] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

CASE NO.

www.facebook.com/#, with the c_user identifier in place of the "#."  For example, the c_user cookie for Mark Zuckerberg is 4.  Logging into Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

144.    Similarly, the "lu" cookie identifies the last Facebook user who logged in using a specific browser.  Like IP addresses, cookies are included with each request that a user's browser makes to Facebook's servers.  Facebook employs similar cookies such as "datr," "fr," "act," "presence," "spin," "wd," "xs," and "fbp" cookies to track users on websites across the internet.[48]  The fbp cookie, for example, is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Facebook Tracking Pixel program.  The fbp cookie emanates from Defendant's web properties but is transmitted to Facebook through cookie synching technology that Facebook employs. These cookies allow Facebook to easily link the browsing activity of its users to their real-world identities, and such highly sensitive data as medical information, religion, and political preferences.[49]

145.    Facebook also uses browser fingerprinting to uniquely identify individuals.  Web browsers have several attributes that vary between users, like the browser software system, plugins that have been installed, fonts that are available on the system, the size of the screen, color depth, and more.  Together, these attributes create a fingerprint that is highly distinctive.  The likelihood that two browsers have the same fingerprint is at least as low as 1 in 286,777, and the accuracy of the fingerprint increases when combined with cookies and the user's IP address.  Facebook recognizes a visitor's browser fingerprint each time a Facebook button is loaded on a third-party website page. Using these various methods, Facebook can identify individual users, watch as they browse third-party websites like www.samc.com and www.saintagnescare.com, and target users with advertising based on their web activity.

---

[48] https://techexpertise.medium.com/facebook-cookies-analysis-e1cf6ffbdf8a#:~:text=browser%20session%20ends.-,%E2%80%9Cdatr%E2%80%9D,security%20and%20site%20integrity%20features.

[49] https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_plugins.pdf

CASE NO.

146.    Facebook then sells advertising space by highlighting its ability to target users. Facebook can target users so effectively because it surveils user activity both on and off its official website.  This allows Facebook to make inferences about users far beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[50]    Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to create highly specific targeted advertising.  Indeed, Facebook utilizes precisely the type of Personal Health Information that Defendant bartered to Facebook so that Facebook can identify, target, and market products and services to individuals.

**F. Defendant has embedded the Meta Pixel tool on its website, resulting in the capture and disclosure of patients' and users' protected health information to Facebook.**

147.    A third-party website that incorporates Meta Pixel benefits from the ability to analyze a user's experience and activity on the website to assess the website's functionality and traffic. The third-party website also gains information from its customers through Meta Pixel that can be used to target them with advertisements, as well as to measure the results of advertising efforts.

148.    Facebook's intrusion into the personal data of visitors to third-party websites incorporating the Meta Pixel is both significant and unprecedented. When Meta Pixel is incorporated into a third-party website, unbeknownst to users and without their consent, Facebook gains the ability to surreptitiously gather every user interaction with the website ranging from what the user clicks on to the personal information entered on a website search bar. Facebook aggregates this data against all websites.[51] Facebook benefits from obtaining this information because it improves its advertising network, including its machine-learning algorithms and its ability to identify and target users with ads.

149.    Facebook provides websites using Meta Pixel with the data it captures in the "Meta Pixel page" in Events Manager, as well as tools and analytics to reach these individuals through

---

[50] https://www.facebook.com/business/ads/ad-targeting

[51] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

CASE NO.

future Facebook ads.[52] For example, websites can use this data to create "custom audiences" to target the specific Facebook user, as well as other Facebook users who match "custom audience's" criteria.[53] Businesses that use Meta Pixel can also search through Meta Pixel data to find specific types of users to target, such as men over a certain age.

150.   Businesses install the Meta Pixel software code to help drive and decode key performance metrics from visitor traffic to their websites.[54] Businesses also use the Meta Pixel to build custom audiences on Facebook that can be used for advertising purposes.[55]

151.   For example, when a user on many of these hospital websites clicks on a "Schedule Online" button next to a doctor's name, Meta Pixel sends the text of the button, the doctor's name, and the search term (such as "cardiology") used to find the doctor to Facebook. If the hospital's website has a drop-down menu to select a medical condition in connection with locating a doctor or making an appointment, that condition is also transmitted to Facebook through Meta Pixel.

152.   Facebook has designed the Meta Pixel such that Facebook receives information about patient activities on hospital websites as they occur in real time. Indeed, the moment that a patient takes any action on a webpage that includes the Meta Pixel—such as clicking a button to register, login, or logout of a patient portal or to create an appointment—Facebook code embedded on that page redirects the content of the patient's communications to Facebook while the exchange of information between the patient and hospital is still occurring.

153.   Defendant is among the hospital systems who have embedded Meta Pixel on their websites.  Via its use of the Meta Pixel, Defendant intercepted and disclosed the contents of Plaintiff's and Class Members' communications with Defendant, including the precise text of patient search queries and communications about specific doctors, communications about medical conditions and treatments, and buttons clicked to Search, Find a Doctor, connect, Login, or Enroll

---

[52] https://www.facebook.com/business/help/742478679120153?id=1205376682832142

[53] https://developers.facebook.com/docs/marketing-api/reference/custom-audience/

[54] https://instapage.com/blog/meta-pixel

[55] https://instapage.com/blog/meta-pixel

CASE NO.

in Defendant's patient portal, summaries of Defendant's responsive communications, the parties to the communications, and the existence of communications at Defendant's websites

154.    For example, when a patient visits the homepage of Defendant's website, the source code employed by Defendant causes personally identifiable information to be transmitted to Facebook.

155.    Likewise, when a patient enters their personal information through Defendant's websites that incorporate Meta Pixel, such as to locate a doctor or make an appointment, this information, including what the patient is being treated for, is immediately and instantaneously routed to Facebook via the Meta Pixel.  The acquisition and disclosure of these communications occurs contemporaneously with the transmission of these communications by patients.

156.    This data, which can include health conditions (e.g., addiction, HIV, heart disease), diagnoses, procedures, test results, the treating physician, medications, as well as personally identifiable information (collectively, "Personal Health Information"), is obtained and used by Facebook, as well as other parties, for the purpose of targeted advertising.

157.    For example, a visitor searching for a doctor on Defendant's website is asked to provide a variety of information to filter the various physicians available to treat various medical conditions, including the doctor's specialty, the patient's insurance plan, and the prospective or actual patient's location:

CASE NO.

158.    All this data was disclosed to Facebook simultaneously in real time as visitors transmitted their information, along with other data, such as the patient's unique Facebook ID that is captured by the c_user cookie, which allows Facebook to link this information to patients' unique Facebook accounts. Defendant also disclosed other personally identifiable information to Facebook, such as patient and user IP addresses, cookie identifiers, browser-fingerprints, and device identifiers.  Defendant also discloses the same kind of information to Google Analytics and Google Double Click every time a patient fills out the above form.

159.    Defendant discloses such personally identifiable information and sensitive medical information even when patients or users are searching for doctors to assist them with conditions such as cancer or pregnancy:

CASE NO.



160.    Likewise, a prospective or current patient who desires an appointment with a doctor is asked to fill out an extensive online questionnaire, which includes information such as the doctor's name, the patient's location, the patient's insurance, and the type of treatment that the patient is seeking:

161.    All this information is acquired by Defendant and forwarded to third parties, including Google, via tracking devices that Defendant has installed on its website.

162.    In other words, Facebook learns not just that patients are seeking treatment, but where and typically when they are seeking treatment, along with other information that patients would reasonably assume that Defendant is not sharing with third-party marketing companies.

163.    Defendant also discloses patient information from across its websites at www.samc.com and www.saintagnescare.com including (but not limited to) communications that are captured by the website's search bar, communications that are captured when a patient searches for services offered by Defendant, communications made by patients using the website's Bill Pay function, communications made when patients access Defendant's patient portal, and communications made when patients are researching specific medical conditions such as COVID-19.

164.    Facebook's Meta Pixel collects and forwards this data to Facebook, including the full referral URL (including the exact subpage of the precise terms being reviewed), and Facebook then correlates the URL with the patient's Facebook user ID, time stamp, browser settings, and even the type of browser used.  In short, the URLs, by virtue of including the particular document within a website that a patient views, reveal a significant amount of personal data about a patient. The captured search terms and the resulting URLs divulge a patient's medical issues, personal interests, queries, and interests on third-party websites operating outside of Facebook's platform.

165.    The transmitted URLs contain both the "path" and the "query string" arising from patients' interactions with Defendant's websites.  The path identifies where a file can be found on a website.  For example, a patient reviewing information about the "Services" that Defendant offers patients such as information about weight loss will generate a URL with the path https://www.samc.com/find-a-service-or-specialty/weight-loss-surgery/.

CASE NO.

166.    Likewise, a query string provides a list of parameters.  An example of a URL that provides a query string is https://www.samc.com/site-search/search-results?q=pregnancy.   The query string parameters in this search indicate that a search was done at Defendant's website for information about pregnancy.  In other words, the Meta Pixel captures information that connects a particular user to a particular healthcare provider.

167.    Defendant also provides Facebook and Google with details about online forms that patients fill out in the form of POST requests.  All the information that patients provide when filling out these forms is also disclosed to Facebook and Google.

168.    As the above demonstrates, knowing what information a patient is reviewing on Defendant's website can reveal deeply personal and private information.  For example, a simple search for "pregnancy" on Defendant's website tells Facebook that the patient is likely pregnant. Indeed, Facebook might know that the patient is pregnant before the patient's close family and friends.  But there is nothing visible on Defendant's website that would indicate to patients that, when they use Defendant's search function, their personally identifiable information and the precise content of their communications with Defendant are being automatically captured and made available to Facebook, who can then use that information for advertising purposes even when patients search for treatment options for sensitive medical conditions such as cancer or substance abuse.

169.    The amount of data collected is significant.  Via the Meta Pixel, when patients interact with its website, Defendant discloses a full-string, detailed URL to Facebook, which contains the name of the website, folder and sub-folders on the webserver, and the name of the precise file requested.  For example, when a patient types a search term into the search bar on Defendant's website, the website returns links to information relevant to the search term.  When patients then click these links, a communication is created that contains a GET request and a full-string detailed URL.

CASE NO.

170.    The contents of patients' search terms shared with Facebook plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Defendant's website.   Worse, no matter how sensitive the area of the Defendant's website that a patient reviews, the referral URL is acquired by Facebook along with other personally identifiable information.

171.    The nature of the collected data is also important.   Defendant's unauthorized disclosures result in Facebook obtaining a comprehensive browsing history of an individual patient, no matter how sensitive the patient's medical condition.  Facebook is then able to correlate that history with the time of day and other user actions on Defendant's website.  This process results in Facebook acquiring a vast repository of personal data about patients—all without their knowledge or consent.

172.    Defendant also discloses the same kind of patient data described above to other third parties involved in internet marketing, including Google, YouTube, Qualtrics, and New Relic, via tracking software that Defendant has installed on its website.  As with the Facebook Meta Pixel, Defendant provides patients and prospective patients with no notice that Defendant is disclosing the contents of their communications to these third parties.  Likewise, Defendant does not obtain consent from patients and prospective patients before forwarding their communications to these companies.

173.    These disclosures to third parties other than Facebook are equally disturbing. Google Analytics, for example, has been described by the Wall Street Journal as "far and away the web's most dominant analytics platform," which "tracks you whether or not you are logged in."[56]  Like Facebook, Google tracks internet users with IP addresses, cookies, geolocation, and other unique device identifiers.   Defendant routinely discloses patients' Personal Health Information to such Google services as Google Analytics, Google DoubleClick, and Google AdWords.

---

[56] https://www.wsj.com/articles/who-has-more-of-your-personal-data-than-facebook-try-google-1524398401

CASE NO.

174.    Google cookies provide personally identifiable data about patients who visit Defendant's website to Google.  Defendant transmits personally identifiable Google cookie data to Google.

175.    Google warns web-developers that Google marketing tools are not appropriate for health-related webpages and websites.  Indeed, Google warns web developers that "Health" is a prohibited category that should not be used by advertisers to target ads to users or promote advertisers' products or services.

176.    Defendant deploys Google tracking tools on nearly every page of its websites, resulting in the disclosure of communications exchanged with patients to be transmitted to Google.  These transmissions occur simultaneously with patients' communications with Defendant and include communications that Plaintiff and Class Members made about specific medical providers, treatments, conditions, appointments, payments, and registrations and logins to Defendant's patient portal.

177.    By compelling visitors to their websites to disclose personally identifiable data and sensitive medical information to Facebook, Defendant knowingly discloses information that allows Facebook and other advertisers to link patients' and visitors' Personal Health Information to their private identities and target them with advertising (or do whatever else Facebook may choose to do with this data, including running "experiments" on its customers by manipulating the information they are shown on their Facebook pages).[57]  Defendant intentionally shared the Personal Health Information of its patients with Facebook in order to gain access to the benefits of the Meta Pixel tool.

178.    Defendant facilitated the disclosure of Plaintiff John Doe's Personal Health Information, including sensitive medical information, to Facebook without his consent or

---

[57] https://www.theatlantic.com/technology/archive/2014/06/everything-we-know-about-facebooks-secret-mood-manipulation-experiment/373648/

CASE NO.

1   authorization when he entered information on the website that Defendant maintains at

2   https://www.samc.com.

3       179.   For example, Plaintiff John Doe is an individual with a Facebook account who is

4   also a patient of Defendant and who has received treatment by Defendant's doctors at Defendant's

5   medical facilities.  Plaintiff John Doe visited Defendant's website in 2022 and entered data,

6   including sensitive medical information, such as details about his medical condition and search

7   for a doctor. The information that Plaintiff John Doe transmitted included queries about treatment

8   for an ear infection and receiving an annual physical. Plaintiff John Doe also used Defendant's

9   patient portal to make an appointment and used Defendant's website to pay medical bills.

10      180.   This information could then be combined with other information in Facebook's

11  possession, like his name, date of birth, and phone number, to more effectively target Plaintiff

12  with advertisements or sell Plaintiff's data to third parties.

13      181.   Because Defendant embedded the Meta Pixel on its website, Defendant disclosed

14  intimate details about Plaintiff's interactions with its website, including Plaintiff's scrolling,

15  typing, and selecting options from drop down menus.  Each time the Meta Pixel was triggered, it

16  caused Plaintiff's information to be secretly transmitted to Facebook's servers, as well as

17  additional information that captures and discloses the communications' content and Plaintiff's

18  identity.  For example, when Plaintiff and Class Members visited Defendant's website, their

19  personal health information was transmitted to Facebook, including such engagement as using the

20  website's search bar, using the website's Find a Doctor function, and typing content into online

21  forms.  During these same transmissions, Defendant's website would also provide Facebook with

22  Plaintiff's and Class Members' Facebook ID, IP addresses, device IDs, and other information that

23  Plaintiff and Class Members provided.  This is precisely the type of information that state and

24  federal law require healthcare providers to de-identify to protect the privacy of patients.

25      182.   Defendant knew that by embedding Meta Pixel—a Facebook advertising tool—it

26  was permitting Facebook to collect, use, and share Plaintiff's and the Class Members' Personal

27

28  CASE NO.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**PAGE 55 EXHIBIT A (CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL)**

Health Information, including sensitive medical information and personally identifiable data. Defendant was also aware that such information would be shared with Facebook simultaneously with patients' interactions with its websites. Defendant made the decision to barter its patients' Personal Healthcare Information to Facebook because it wanted access to the Meta Pixel tool. While that bargain may have benefited Defendant and Facebook, it also betrayed the privacy rights of Plaintiff and Class Members.

**G. Defendant's interception and disclosure of patient communications permits Facebook, Google, and other third-party advertising companies to engage in cross-device targeting across multiple devices.**

183.    In addition to enabling Defendant to advertise to patients and potential patients on non-Defendant websites, Defendant's misuse and exploitation of patient data and communications also facilitates third parties' ability to target advertisements on other computing devices that a patient uses. This is called cross-device targeting.

184.    Third parties including Facebook and Google have established a unique ID for individuals that tie together their desktop, laptop, and smartphone computing devices. For example, even if a patient has never visited Defendant's website on their smartphone, cross-device tracking and marketing allows Defendant and other third parties to target patients on that device. In other words, a patient or potential patient who visited Defendant's website on his desktop, but never on his smartphone, can nevertheless be targeted with advertisements by both Defendant and other third parties on his smartphone.

185.    Defendant's and other third parties' use of cross-device targeting demonstrates that the data Defendant discloses to third parties is personally identifiable because it enables patients to be tracked across multiple devices that patients own—even if a patient has never communicated with Defendant on one or more of their devices.

186.    Defendant has made the decision that access to the targeted advertising (including retargeting and cross-device tracking) that is enabled by its disclosure of patient data and communications is of commercial benefit to Defendant.

CASE NO.

187.     Defendant obtains additional revenue from its deployment of third-party tracking tools through which it discloses personally identifying patient data and communications to third parties, including Google and Facebook.

188.     Any additional revenue that that Defendant obtained from its unauthorized misuse of its own patients' Personal Health Information is unearned and is the rightful property of the patients (including Plaintiff and Class Members) from whom it was obtained.

189.     Defendant's unauthorized disclosure and misuse of Plaintiff's and Class Members' Personal Health Information is a form of theft, for which the victims are entitled to recover anything acquired with the stolen assets, even if the items acquired have a value that exceeds the value of that which was stolen.

**H.  Plaintiff and the Class Members did not consent to the interception and disclosure of their protected health information.**

190.     Plaintiff and Class Members had no idea when they interacted with Defendant's websites that their personal data, including sensitive medical data, was being collected and simultaneously transmitted to Facebook. That is because, among other things, the Meta Pixel tool is seamlessly and secretly integrated into Defendant's websites and is invisible to patients visiting those websites.

191.     For example, when Plaintiff John Doe visited Defendant's website in 2022, there was no indication that the Meta Pixel was embedded on that website or that it would collect and transmit his sensitive medical data to Facebook.  Nor did Plaintiff John Doe receive any notice or indication when he visited Defendant's website that his Personal Health Information was being collected, transmitted, and monitored by Facebook for advertising purposes.

192.     Plaintiff and his fellow Class Members could not consent to Defendant's conduct when there was no indication that their sensitive medical information would be collected and transmitted to Facebook, Google, and other third parties in the first place.

193.    While Defendant purports to have a "Privacy Policy," that Privacy Policy is effectively hidden from patients, buried at the bottom of Defendant's homepage in type so small as to be unreadable to many visitors:[58]



**TERMS OF USE    PRIVACY POLICY    NON-DISCRIMINATION POLICY    OUTLOOK    CLAIRVIA    SITE MAP
ICC COVID-19    PRIVACY INCIDENT DETAIL**

**Language Assistance:** English | Español | 中文 | Tagalog | Tiếng Việt | Français | 한국어 | Deutsch | عربي | русский | Kreyòl Ayisyen

© 2023 Saint Agnes Medical Center.

194.    Moreover, Defendant's "Notice of Privacy Practices" gives no indication to patients that Defendant routinely allows Facebook, Google, and other third parties to capture and exploit patients' and users' Personal Health Information. Indeed, Defendant expressly promises in its Privacy Policy that Saint Anges Medical Center "is committed to protecting medical information about you."[59]

195.    This statement is false, deceptive, and misleading because Defendant, in fact, tracks patients' and potential patients' IP addresses, cookies, browser-fingerprints, and device identifiers, of which it then causes the transmission to third parties along with patients' and potential patients' sensitive medical information.

196.    Defendant also assures its patients that any "uses and disclosures of medical information for marketing purposes" will "require your authorization."[60]  Defendant further promises that any "uses and disclosures of medical information not covered by this notice or the laws that apply to us will be made only with your written permission."[61]

---

[58] https://www.samc.com/

[59] https://www.samc.com/assets/documents/privacy-and-legal/samc-th-npp-2017-nodate.pdf

[60] https://www.samc.com/assets/documents/privacy-and-legal/samc-th-npp-2017-nodate.pdf

[61] https://www.samc.com/assets/documents/privacy-and-legal/samc-th-npp-2017-nodate.pdf

CASE NO.

197.    These statements are also false, deceptive, and misleading because, contrary to Defendant's representations, it has routinely sold and/or bartered its patients' sensitive medical information to Facebook, Google, and other third parties without its patients' knowledge or consent.

198.    Even if a visitor stumbled upon Defendant's carefully hidden "Privacy Policy," nothing in that notice would be understood by any reasonable prospective or current patient to mean that Defendant is bartering its patients' Personal Health Information in return for access to Facebook's Meta Pixel tool.  Indeed, Defendant expressly promises that it will *never* share patients' medical information with marketing companies for their own direct marketing uses without express authorization from patients.

199.    What's more, the very term "Privacy Policy" is deceptive.    Research has consistently shown that a majority of Americans who see that a website has a "Privacy Policy" falsely believe that the company with the policy cannot (and will not) disclose information about them to third parties without their consent.

200.    It is against the law for Defendant to disclose individually identifying health information without giving appropriate notice to the patient and obtaining written consent.

201.    Defendant does not have a legal right to share Plaintiff's and Class Members' Protected Health Information with Facebook, because this information is protected from such disclosure by law. *See, e.g.*, CAL. CIV. CODE §§ 56 *et seq.*; 45 C.F.R. § 164.508. Defendant is also not permitted to disclose patients' Protected Health Information to advertising and marketing companies like Facebook and Google without express written authorization from patients.

202.    The United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting individually identifiable health information via tracking technology like the Meta Pixel without a patient's authorization and other protections like a business associate agreement with the recipient of the patient data.

CASE NO.

203.     Defendant failed to obtain a valid written authorization from Plaintiff or any of the Class Members to allow the capture and exploitation of their personally identifiable information and the contents of their communications by third parties for their own direct marketing uses. Moreover, no *additional* privacy breach by Facebook is necessary for harm to have accrued to Plaintiff and Class Members; the secret disclosure by Defendant of its patients' Personal Health Information to Facebook means that a significant privacy injury has *already occurred.*

204.     Likewise, a prospective or current patient's reasonable expectation that their health care provider will not share their information with third parties for marketing purposes is not subject to waiver via an inconspicuous privacy policy hidden away on a company's website.

205.     Defendant violated its own privacy policy by unlawfully intercepting and disclosing Plaintiff's and Class Members' Personal Health Information to Facebook and other third parties without disclosing such activity and without obtaining patients' written consent to share such information.

206.     Accordingly, Defendant lacked authorization to intercept, collect, and disclose Plaintiff's and Class Members' Personal Health Information to Facebook or aid in the same.

**I.  The disclosures of personal patient data to Facebook are unnecessary.**

207.     There is no information anywhere on the websites operated by Defendant that would alert patients that their most private information (such as their identifiers, their medical conditions, and their medical providers) is being automatically transmitted to Facebook. Nor are the disclosures of patient Personal Health Information to Facebook necessary for Defendant to maintain their healthcare website or provide medical services to patients.

208.     For example, it is possible for a healthcare website to provide a doctor search function without allowing disclosures to third-party advertising companies about patient sign ups or appointments. It is also possible for a website developer to utilize tracking tools without allowing disclosure of patients' Personal Healthcare Information to companies like Facebook. Likewise, it is possible for Defendant to provide medical services to patients without sharing their

Personal Health Information with Facebook so that this information can be exploited for advertising purposes.

209.    Despite these possibilities, Defendant willfully chose to implement Meta Pixel on its websites and aid in the disclosure of personally identifiable information and sensitive medical information about its patients, as well as the contents of their communications with Defendant, to third parties, including Facebook and Google.

**J. Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, especially with respect to sensitive medical information.**

210.    Plaintiff and Class Members have a reasonable expectation of privacy in their Personal Health Information, including personally identifiable data and sensitive medical information. Defendant's surreptitious interception, collection, and disclosure of Personal Health Information to Facebook violated Plaintiff's and Class Member's privacy interests.

211.    As patients, Plaintiff had a reasonable expectation of privacy that his health care provider and its associates would not disclose his Personal Health Information to third parties without his express authorization.

212.    The original Hippocratic Oath, circa 400 B.C., provided that physicians must pledge, "What I may see or hear in the course of treatment or even outside of the treatment in regard to the life of man, which on no account must be spread abroad, I will keep to myself holding such things shameful to be spoken about."[62]

213.    The modern Hippocratic Oath provides, "I will respect the privacy of my patients, for their problems are not disclosed to me that the world may know."[63]  Likewise, the American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.  For example, the AMA has issued medical ethics opinions providing that "[p]rotecting information gathered in association with the care of a patient is a core value in health care.  However, respecting patient privacy in other forms is also

---

[62] *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 n.1 (Mo. 1993).

[63] https://www.pbs.org/wgbh/nova/doctors/oath_modern.html

CASE NO.

fundamental, as an expression of respect for patient autonomy and a prerequisite for trust…. Physicians must seek to protect patient privacy in all settings to the greatest extent possible and should … [m]inimize intrusion on privacy when the patient's privacy must be balanced against other factors [and inform] the patient when there has been a significant infringement on privacy of which the patient would otherwise not be aware."[64]

214.   The AMA's ethics opinions have further cautioned physicians and hospitals that "[d]isclosing information to third parties for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship." [65]

215.   Patient health information is specifically protected by law. The prohibitions against disclosing patient Personal Health Information include prohibitions against disclosing personally identifiable data such as patient names, IP addresses, and other unique characteristics or codes. *See, e.g.*, CAL. CIV. CODE § 56.05 ("medical information"); 45 C.F.R. § 164.514.

216.   Plaintiff's and Class Members' reasonable expectations of privacy in their Personal Health Information are grounded in, among other things, Defendant's status as a health care provider, Defendant's common law obligation to maintain the confidentiality of patients' Personal Health Information, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Defendant's express and implied promises of confidentiality.

217.   Given the application of these laws to Defendant, coupled with Defendant's express promises that they would protect the confidentiality of patients' Personal Health

---

[64] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.1.1).

[65] https://www.ama-assn.org/sites/ama-assn.org/files/corp/media-browser/code-of-medical-ethics-chapter-3.pdf (opinion 3.2.4).

CASE NO.

Information, Plaintiff and the Members of the Class had a reasonable expectation of privacy in their protected health information.

218.    Indeed, several studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

219.    Polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

220.    For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[66]

221.    Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[67]

222.    "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards:*

---

[66] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/

[67] https://www.wired.co.uk/article/apple-ios14-facebook

CASE NO.

1   *Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557

2   (2009).

3       223.    The concern about sharing personal medical information is compounded by the

4   reality that advertisers view this type of information as particularly valuable. Indeed, having

5   access to the data women share with their healthcare providers allows advertisers to obtain data

6   on children before they are even born. As one recent article noted, "What is particularly worrying

7   about this process of datafication of children is that companies like [Facebook] are harnessing and

8   collecting multiple typologies of children's data and have the potential to store a plurality of data

9   traces under unique ID profiles."[68]

10      224.    Many privacy law experts have expressed serious concerns about patients'

11  sensitive medical information being disclosed to third-party companies like Facebook. As those

12  critics have pointed out, having a patient's Personal Health Information disseminated in ways the

13  patient is unaware of could have serious repercussions, including affecting their ability to obtain

14  life insurance, how much they might pay for such coverage, the rates they might be charged on

15  loans, and the likelihood of their being discriminated against.

16  **K. Plaintiff's and Class Members' Personal Health Information that Defendant collected,
    disclosed, and used has economic value, and its disclosure has caused Plaintiff and Class
17  Members harm.**

18      225.    Plaintiff's and Class Members' Personal Health Information that Defendant

19  collected, monitored, disclosed, and used is Plaintiff's and Class Members' property, has

20  economic value, and its illicit disclosure has caused Plaintiff and Class Members harm.

21      226.    It is common knowledge that there is an economic market for consumers' personal

22  data—including the kind of data that Defendant has collected and disclosed from Plaintiff and

23  Class Members.

24

25

26

27  ---
    [68] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

28  CASE NO.

227.    In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[69]

228.    In 2015, *TechCrunch* reported that "to obtain a list containing the names of individuals suffering from a particular disease," a market participant would have to spend about "$0.30" per name.[70] That same article noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge" and that the value of a single user's data can vary from $15 to more than $40 per user.[71]

229.    Likewise, some companies sell de-identified health information in the open market.  For example, a company named Prognos Health provides a data platform where it purports to sell information from "more than 325 million de-identified patients."[72]

230.    In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[73] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[74]

231.    Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third-party data marketing companies because of the strict restrictions on disclosure of such information by state laws and provider

---

[69] https://ig.ft.com/how-much-is-your-personal-data-worth/

[70] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[71] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[72] https://prognoshealth.com/about-us/news/press-release/prognos-health-announces-patent-pending-technology

[73] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

[74] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/

CASE NO.

standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[75]

232.    Further, individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[76] and has paid teenagers and adults up to $20 per month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[77]

233.    A myriad of other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[78]

234.    Given the monetary value that data companies like Facebook have already paid for personal information in the past, Defendant has deprived Plaintiff and the Class Members of the economic value of their sensitive medical information by collecting, using, and disclosing that information to Facebook, Google, and other third parties without consideration for Plaintiff's and the Class Members' rights.

**L. Defendant is enriched by making unlawful, unauthorized, and unnecessary disclosures of patients' and users' protected health information.**

235.    In exchange for disclosing Personal Health Information about its patients and users, Defendant is compensated by Facebook with enhanced online advertising services, including (but not limited to) retargeting and enhanced analytics functions. For example, one hospital system, Aurora Advocate Health, recently explained that it had installed the Meta Pixel tool and similar technologies "to gather information that we review in aggregate so that we can better understand patient needs and preferences."[79]   Likewise, a second hospital system,

---

[75] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

[76] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounaciations-app

[77] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[78] https://www.creditdonkey.com/best-apps-data-collection.html; *see also https://www.monetha.io/blog/rewards/earn-money-from-your-data/*

[79] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

CASE NO.

WakeMed, recently explained that it had installed the Meta Pixel tool "to optimize the functionality of our websites so that we can improve the user experience."[80]

236.    Similarly, retargeting is a form of online targeted advertising that targets users with ads based on their previous internet actions, which is facilitated through the use of cookies and tracking pixels. Hospital systems using the Meta Pixel can also take advantage of retargeting to display ads to "target audiences" composed of visitors to their websites.

237.    Once an individual's data is disclosed and shared with a third-party marketing company, however, the advertiser is able to show ads to the user elsewhere on the internet.

238.    Retargeting allows third party advertisers to show advertisements on other websites to customers or potential customers based on the specific communications exchanged by a patient or their activities on a website.  Using the Meta Pixel, a company could target ads on Facebook itself or on the Facebook advertising network. The same or similar advertising can be accomplished via disclosures to other third-party advertisers and marketers.

239.    Worse, once personally identifiable information relating to patient communications is disclosed to third parties like Facebook, Defendant loses the ability to control how that information is subsequently disseminated and exploited.

240.    The monetization of the data being disclosed both by Defendant and Facebook, demonstrates the inherent value of the information being collected.

**M.  Facebook's history of egregious privacy violations.**

241.    Defendant knew or should have known that Facebook could not be trusted with its patients' sensitive medical information.

242.    Due to its ability to target individuals based on granular data, Facebook's ad-targeting capabilities have frequently come under scrutiny. For example, in June 2022, Facebook entered into a settlement with the Department of Justice regarding its Lookalike Ad service, which permitted targeted advertising by landlords based on race and other demographics in a

---

[80] https://www.wakemed.org/patients-and-visitors/patient-rights-and-privacy-policies/meta-pixel-privacy#:~:text=Protecting%20the%20privacy%20and%20security,(now%20Meta)%20in%20error.

CASE NO.

discriminatory manner. That settlement, however, reflected only the latest in a long history of egregious privacy violations by Facebook.

243.    In 2007, when Facebook launched "Facebook Beacon," users were unaware that their online activity was tracked and that the privacy settings originally did not allow users to opt-out. As a result of widespread criticism, Facebook Beacon was eventually shut down.

244.    Two years later, Facebook made modifications to its Terms of Service, which allowed Facebook to use anything a user uploaded to its site for any purpose, at any time, even after the user ceased using Facebook. The Terms of Service also failed to provide for any way for users to completely delete their accounts. Under immense public pressure, Facebook eventually returned to its prior Terms of Service.

245.    In 2011, Facebook settled charges with the Federal Trade Commission relating to its sharing of Facebook user information with advertisers, as well as its false claim that third-party apps were able to access only the data they needed to operate when—in fact—the apps could access nearly all of a Facebook user's personal data. The resulting Consent Order prohibited Facebook from misrepresenting the extent to which consumers can control the privacy of their information, the steps that consumers must take to implement such controls, and the extent to which Facebook makes user information available to third parties.[81]

246.    Facebook found itself in another privacy scandal in 2015 when it was revealed that Facebook could not keep track of how many developers were using previously downloaded Facebook user data. That same year, it was also revealed that Facebook had violated users' privacy rights by harvesting and storing Illinois' users' facial data from photos without asking for their consent or providing notice. Facebook ultimately settled claims related to this unlawful act for $650 million.

247.    In 2018, Facebook was again in the spotlight for failing to protect users' privacy. Facebook representatives testified before Congress that a company called Cambridge Analytica

---

[81] https://www.ftc.gov/legal-library/browse/cases-proceedings/092-3184-182-3109-c-4365-facebook-inc-matter

CASE NO.

1    may have harvested the data of up to 87 million users in connection with the 2016 election. This

2    led to another FTC investigation in 2019 into Facebook's data collection and privacy practices,

3    resulting in a record-breaking five-billion-dollar settlement.

4         248.    Likewise, a different 2018 report revealed that Facebook had violated users'

5    privacy by granting access to user information to over 150 companies.[82] Some companies were

6    even able to read users' private messages.

7         249.    In June 2020, after promising users that app developers would not have access to

8    data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-

9    party developers to access this data.[83] This failure to protect users' data enabled thousands of

10   developers to see data on inactive users' accounts if those users were Facebook friends with

11   someone who was an active user.

12        250.    On February 18, 2021, the New York State Department of Financial Services

13   released a report detailing the significant privacy concerns associated with Facebook's data

14   collection practices, including the collection of health data. The report noted that while Facebook

15   maintained a policy that instructed developers not to transmit sensitive medical information,

16   Facebook received, stored, and analyzed this information anyway. The report concluded that

17   "[t]he information provided by Facebook has made it clear that Facebook's internal controls on

18   this issue have been very limited and were not effective … at preventing the receipt of sensitive

19   data."[84]

20        251.    The New York State Department of Financial Service's concern about Facebook's

21   cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a

22   different settlement involving Facebook's monetizing of sensitive medical data. In that case, the

23   more than 100 million users of Flo, a period and ovulation tracking app, learned something

---

[82] https://www.cnbc.com/2018/12/19/facebook-gave-amazon-microsoft-netflix-special-access-to-data-nyt.html

[83] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/

[84] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf

CASE NO.

startling: the company was sharing their data with Facebook.[85] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[86]

252.    More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that "We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[87]

253.    These revelations were confirmed by an article published by the Markup on June 16, 2022, which found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[88]

254.    Despite knowing that the Meta Pixel code embedded in its websites was sending patients' Personal Health Information to Facebook, Defendant did nothing to protect patients and

---

[85] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

[86] https://slate.com/technology/2022/06/health-data-brokers-privacy.html

[87] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes

[88] https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites

CASE NO.

1  users from egregious intrusions into patient privacy, choosing instead to benefit at those patients'

2  and users' expense.

**N. Defendant's failure to inform its patients and prospective patients that their Personal Health Information has been disclosed to Facebook or to take any steps to halt the continued disclosure of patients' Personal Health Information is malicious, oppressive, and in reckless disregard of Plaintiff's and Class Members' rights.**

255.    Hospital systems, like other businesses, have a legal obligation to disclose data breaches to their customers. *E.g.* Cal. Civ. Code § 1798.82.

256.    After publication of the Markup's investigative article in June 2022, hospital systems around the United States began self-reporting data breaches arising from their installation of pixel technology on their websites.[89]

257.    For example, in August 2022, Novant Health informed approximately 1.3 million patients that their medical data was disclosed to Facebook due to the installation of the Facebook Meta Pixel on the hospital system's websites.[90]   Novant Health's data breach announcement conceded that the Meta Pixel tool installed on its websites "allowed certain private information to be transmitted to Meta from the Novant Health website."[91] Novant Health further admitted that the information about its patients that was disclosed to Facebook included "an impacted patient's: demographic information such as email address, phone number, computer IP address, and contact information entered into Emergency Contacts or Advanced Care Planning; and information such as appointment type and date, physician selected, button/menu selections, and/or content typed into free text boxes."[92]

---

[89] https://www.scmagazine.com/analysis/breach/pixel-fallout-expands-community-health-informs-1-5m-of-unauthorized-disclosure

[90] https://www.scmagazine.com/analysis/breach/1-3m-novant-health-patients-notified-of-unintended-disclosure-via-facebook-pixel

[91] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx

[92] https://www.novanthealth.org/home/about-us/newsroom/press-releases/newsid33987/2672/novant-health-notifies-patients-of-potential-data-privacy-incident-.aspx

CASE NO.

258.    Likewise, in October 2022, Advocate Aurora Health informed approximately 3 million patients that their Personal Health Information had been disclosed to Facebook via the Meta Pixel installed on Advocate Aurora Health's website.[93]

259.    Advocate Aurora Health's data breach notification conceded that patient information had been transmitted to third parties including Facebook and Google when patients used the hospital system's website.[94]

260.    Advocate Aurora Health further admitted that a substantial amount of its patients' Personal Health Information has been shared with Facebook and Google including patients' "IP address; dates, times, and/or locations of scheduled appointments; your proximity to an Advocate Aurora Health location; information about your provider; [and] type of appointment or procedure."[95]  Even more troubling, Advocate Aurora Health admitted that "[w]e cannot confirm how vendors used the data they collected."[96]

261.    Advocate Aurora Health claimed that, in conjunction with its data breach notice, the hospital system had "disabled and/or removed the pixels from our platforms and launched an internal investigation to better understand what patient information was transmitted to our vendors."[97]  Advocate Aurora Health also promised its 3 million patients that the company had instituted an "enhanced, robust technology vetting process" to prevent such disclosures of its patients' Personal Health Information in the future.[98]

262.    Similarly, in October 2022, WakeMed notified more than 495,000 patients that their Personal Health Information had been transmitted to Facebook through the use of tracking

---

[93] https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3

[94] https://www.advocateaurorahealth.org/

[95] https://www.advocateaurorahealth.org/pixel-notification/faq

[96] https://www.advocateaurorahealth.org/pixel-notification/faq

[97] https://www.advocateaurorahealth.org/pixel-notification/faq

[98] https://www.advocateaurorahealth.org/pixel-notification/faq

CASE NO.

pixels installed on its websites.[99]   In announcing this data breach, WakeMed admitted that the Facebook Meta Pixel tool had been installed on its website resulting in the transmission of patient information to Facebook.[100]   WakeMed further admitted that "[d]epending on the user's activity, the data that may have been transmitted to Facebook could have included information such as: email address, phone number, and other contact information; computer IP address; emergency contact information; information provided during online check-in, such as allergy or medication information; COVID vaccine status; and information about an upcoming appointment, such as appointment type and date, physician selected, and button/menu selections."[101]

263.   WakeMed also conceded that it had no idea what Facebook had done with the Personal Health Information that WakeMed had disclosed about its patients.[102]   Like the other hospital systems who have come clean about their use of the Meta Pixel tool, WakeMed promised its patients that it had "proactively disabled Facebook's pixel" and had "no plans to use it in the future without confirmation that the pixel no longer has the capacity to transmit potentially sensitive or identifiable information."[103]

264.   In November 2022, the fallout from hospital systems' use of the Meta Pixel tool expanded when Community Health Network informed 1.5 million of its patients that their personal health information had been routinely transmitted and disclosed to Facebook since at least April 2017.[104]

---

[99] https://healthitsecurity.com/news/wakemed-faces-data-breach-lawsuit-over-meta-pixel-use

[100] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[101] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[102] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[103] https://www.wakemed.org/about-us/news-and-media/wakemed-news-releases/wakemed-notifies-patients-of-potential-data-privacy-incident

[104] https://healthitsecurity.com/news/community-health-network-notifies-1.5m-of-data-breach-stemming-from-tracking-tech; *see also* https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

CASE NO.

265.     In its data breach notice, Community Health admitted that it had "discovered through our investigation that the configuration of certain technologies allowed for a broader scope of information to be collected and transmitted to each corresponding third-party tracking technology vendor (e.g., Facebook and Google) than Community had ever intended." Community Health further conceded that its use of the Meta Pixel and related third-party tracking technologies had resulted in surreptitiously recording and transmitting a wide range of patient engagements with its websites, including "scheduling an appointment online or directly with a provider" and "seeking treatment at a Community or affiliated provider location."[105]

266.     Community Health, like WakeMed, Novant, and Advocate Aurora Health, also promised its patients that it had disabled or removed the third-party tracking technologies that it had installed on its website and had instituted new "evaluation and management processes for all website technologies moving forward."[106]  Community Health, however, also conceded that it had no idea how Facebook or other third parties had exploited the patient Personal Health Information that had been disclosed to them via the pixel technology.

267.     Unlike Community Health, WakeMed, Novant, Advocate Aurora Health, and other responsible hospital systems who have informed their patients of the serious privacy violations resulting from the installation of Facebook's Meta Pixel tool on their websites, Defendant has done nothing.  Indeed, not only has Defendant hidden these privacy violations from its patients, but Defendant continues to collect, transmit, and disclose its patients' Personal Health Information to Facebook despite widespread knowledge in the health care community that such collection and disclosure of patient Personal Health Information is patently illegal and in violation of patient's fundamental privacy rights.

268.     As these data breach announcements demonstrate, there is widespread knowledge within the health care community that installation of the Meta Pixel tool on hospital websites

---

[105] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

[106] https://www.ecommunity.com/notice-third-party-tracking-technology-data-breach

CASE NO.

1   results in the disclosure of patients' Personal Health Information to Facebook.  There is also

2   widespread recognition that such disclosures are not only illegal but fundamentally unethical,

3   given the privacy rights involved.

4       269.    Defendant's decision to hide its use of the Meta Pixel tool from its own patients

5   and its refusal to remove all such technologies from its websites even after learning that its

6   patients' Personal Health Information was being routinely collected, transmitted, and exploited

7   by Facebook, Google, and other third parties is malicious, oppressive, and in reckless disregard

8   of Plaintiff's and Class Members' rights.

9   **O.  Tolling, Concealment, and Estoppel**

10      270.    The applicable statutes of limitation have been tolled as a result of Defendant's

11  knowing and active concealment and denial of the facts alleged herein.

12      271.    Defendant seamlessly and secretively incorporated Meta Pixel and other trackers

13  into their websites, providing no indication to users that they were interacting with a website

14  enabled by Meta Pixel. Defendant had knowledge that its websites incorporated Meta Pixel and

15  other trackers yet failed to disclose that by interacting with Meta-Pixel enabled websites that

16  Plaintiff's and Class Members' sensitive medical information would be intercepted, collected,

17  used by, and disclosed to Facebook.

18      272.    Plaintiff and Class Members could not with due diligence have discovered the full

19  scope of Defendant's conduct, because there were no disclosures or other indication that they

20  were interacting with websites employing Meta Pixel.

21      273.    All applicable statutes of limitation have also been tolled by operation of the

22  discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure

23  of patients' and users' Personal Health Information has continued unabated through the date of

24  the filing of Plaintiff's Original Complaint. What's more, Defendant was under a duty to disclose

25  the nature and significance of its data collection practices but did not do so. Defendant is therefore

26  estopped from relying on any statute of limitations defenses.

27

28

Case No.

1

## V. CLASS DEFINIITION

2    274.   Defendant's conduct violates the law and breaches express and implied privacy

3 promises.

4    275.   Defendant's unlawful conduct has irreparably injured Plaintiff and Class

5 Members.

6    276.   Defendant's conduct is ongoing.

7    277.   Plaintiff brings this action individually and as a class action against Defendant.

8    278.   Plaintiff brings this action in accordance with the Code of Civil Procedure Rule

9 382 individually and on behalf of the following proposed Class and Subclass:

10       **The Saint Agnes Medical Center Class:** For the period March
2, 2018, to the present, all current California citizens who are, or
11       were, patients or prospective patients of Saint Agnes Medical
Center or any of its affiliates and who exchanged communications
12       at Defendant's websites, including https://www.samc.com and
https://saintagnescare.com and any other Saint Agnes affiliated
13       website, including Defendant's patient portals.

14       **The Patient Subclass:** For the period March 2, 2018, to the
present, all current California citizens who are, or were, patients
15       of Saint Agnes Medical Center or any of its affiliates and who
exchanged communications at Defendant's websites, including
16       https://www.samc.com and https://saintagnescare.com and any
other Saint Agnes affiliated website, including Defendant's
17       patient portals.

18
19    279.   Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding

20 over this action or appellate judge assigned to this case and any members of their staff and

21 immediate families; (2) any jurors assigned to hear this case as well as their immediate families;

22 (3) the Defendant, Defendant's subsidiaries, affiliates, parents, successors, predecessors, and any

23 entity in which the Defendant or its parents have a controlling interest and their current or former

24 employees, officers, and directors; and (4) Plaintiff's counsel and Defendant's counsel.

25    280.   Plaintiff and Class Members satisfy the numerosity, commonality, typicality,

26 adequacy, and predominance requirements for suing as representative parties.

27

28

CASE NO.

281. **Numerosity:** The exact number of members of the Class is unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals throughout California. The exact number of Class Members can be determined by review of information maintained by Defendant. The proposed class is defined objectively in terms of ascertainable criteria, such that the Court may determine the constituency of the class for the purposes of the conclusiveness of any judgment that may be rendered.

282. **Predominant Common Questions:** The Class's claims present common questions of law and fact, and those questions predominate over any questions that may affect individual Class members. Common questions for the Class include, but are not limited to, the following:

(a) Whether Defendant violated Plaintiff's and Class Members' privacy rights;

(b) Whether Defendant's acts and practices violated California's Constitution, Art. 1, § 1;

(c) Whether Defendant's acts and practices violated California's Confidentiality of Medical Information Act, CIVIL CODE §§ 56, *et seq.*;

(d) Whether Defendant's acts and practices violated the California Invasion of Privacy Act, CAL. PENAL CODE §§ 630, *et seq.*;

(e) Whether Defendant's acts and practices violated the California Comprehensive Computer Data Access and Fraud Act, CAL. PENAL CODE § 502;

(f) Whether Defendant's acts and practices violated California's Online Privacy Protection Act, CAL. BUS. & PROF. CODE §§ 22575, *et seq*;

(g) Whether Defendant's acts and practices violated California's Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200, *et seq*;

(h) Whether Defendant's acts and practices violated CAL. CIVIL CODE §§ 1798.81.5, § 1798.81.5;

(i) Whether Defendant's acts and practices violated CAL. CIVIL CODE § 1798.83;

(j) Whether Defendant was unjustly enriched;

(k)     Whether Plaintiff and the Class Members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and,

(l)     Whether Plaintiff and the Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

283.    **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class. The claims of Plaintiff and the members of the Class arise from the same conduct by Defendant and are based on the same legal theories.

284.    **Adequate Representation:** Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interest that is in conflict with the interests of the Class, and Defendant has no defenses unique to any Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of the other members of the Class.

285.    **Substantial Benefits:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

286.    Plaintiff reserves the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

CASE NO.

# VI. CLAIMS FOR RELIEF

## COUNT I—VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA") CAL. PENAL CODE §§ 630, *ET SEQ.*

287.    Plaintiff re-alleges and incorporates all preceding paragraphs.

288.    Plaintiff brings this claim on behalf of himself and all members of the Saint Agnes Medical Center Class.

289.    The California Legislature enacted the California Invasion of Privacy Act, CAL. PENAL CODE §§ 630, *et seq*. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630. Thus, the intent behind CIPA is "to protect the right of privacy of the people of this state." *Id.*

290.    CAL. PENAL CODE § 631(a) generally prohibits individuals, businesses, and other legal entities from "aid[ing], agree[ing] with, employ[ing], or conspir[ing] with" a third party to read, attempt to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or while it is being sent from, or received at any place within this state; or to use, or attempt to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained.

291.    CAL. PENAL CODE § 632(a) generally prohibits individuals, businesses, and other legal entities from recording confidential communications without consent of all parties to the communication.

292.    All alleged communications between Plaintiff or Class Members and Defendant qualify as protected communications under CIPA because each communication is made using personal computing devices (e.g., computers, smartphones, tablets) that send and receive

CASE NO.

communications in whole or in part through the use of facilities used for the transmission of communications aided by wire, cable, or other like connections.

293.    Defendant used a recording device to record the confidential communications without the consent of Plaintiff or Class Members and then transmitted such information to others, such as Facebook.

294.    At all relevant times, Defendant's aiding Facebook, Google, and other third parties to learn the contents of communications and Defendant's recording of confidential communications was without authorization and consent.

295.    The Plaintiff and Class Members had a reasonable expectation of privacy regarding the confidentiality of their communications with Defendant. Defendant told them it would not sell, rent, license, or trade their personally identifiable information to third parties without express consent. Defendant never received that express consent. Nor could Defendant have received consent from Plaintiff and Class Members because Defendant never sought to, or did, obtain Plaintiff's and Class Members' consent to transmit their Personal Health Information to Facebook.

296.    Defendant engaged in and continues to engage in interception by aiding others (including Facebook) to secretly record the contents of Plaintiff's and Class Members' wire communications.

297.    The intercepting devices used in this case include, but are not limited to:

(a)    Plaintiff and Class Members' personal computing devices;

(b)    Plaintiff and Class Members' web browsers;

(c)    Plaintiff and Class Members' browser-managed files;

(d)    Facebook's Meta Pixel;

(e)    Internet cookies;

(f)    Defendant's computer servers;

(g)    Third-party source code utilized by Defendant; and

(h)     Computer servers of third parties (including Facebook) to which Plaintiff and Class Members' communications were disclosed.

298.    Defendant aided in, and continues to aid in, the interception of contents in that the data from the communications between Plaintiff and/or Class Members and Defendant that were redirected to and recorded by the third parties include information which identifies the parties to each communication, their existence, and their contents.

299.    Defendant aided in the interception of "contents" in at least the following forms:

(a)     The parties to the communications;

(b)     The precise text of patient search queries;

(c)     Personally identifying information such as patients' IP addresses, Facebook IDs, browser fingerprints, and other unique identifiers;

(d)     The precise text of patient communications about specific doctors;

(e)     The precise text of patient communications about specific medical conditions;

(f)     The precise text of patient communications about specific treatments;

(g)     The precise text of patient communications about scheduling appointments with medical providers;

(h)     The precise text of patient communications about billing and payment;

(i)     The precise text of specific buttons on Defendant's website(s) that patients click to exchange communications, including Log-Ins, Registrations, Requests for Appointments, Search, and other buttons;

(j)     The precise dates and times when patients click to Log-In on Defendant's website(s);

(k)     The precise dates and times when patients visit Defendant's websites;

(l)     Information that is a general summary or informs third parties of the general subject of communications that Defendant sent back to patients

in response to search queries and requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

(m)   Any other content that Defendant has aided third parties in scraping from webpages or communication forms at web properties.

300.   Plaintiff and Class Members reasonably expected that their Personal Health Information was not being intercepted, recorded, and disclosed to Facebook, Google, and other third parties.

301.   No legitimate purpose was served by Defendant's willful and intentional disclosure of Plaintiff's and Class Members' Personal Health Information to Facebook, Google, and other third parties. Neither Plaintiff nor Class Members consented to the disclosure of their Personal Health Information by Defendant to Facebook, Google, and other third parties. Nor could they have consented, given that Defendant, for example, never sought Plaintiff's or Class Members' consent, or even told visitors to their websites that their every interaction was being recorded and transmitted to Facebook via the Meta Pixel tool.

302.   Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Personal Health Information, including using their sensitive medical information, to develop marketing and advertising strategies.

303.   Plaintiff and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

304.   In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

CASE NO.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**PAGE 82 EXHIBIT A (CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL)**

    (a)    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

    (b)    Defendant eroded the essential confidential nature of the doctor-patient relationship; and

    (c)    Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

305.    Plaintiff and Class Members have also suffered irreparable injury from Defendant's unauthorized acts of disclosure. Their personal, private, and sensitive data has been collected, viewed, accessed, stored, and used by Defendant and Facebook without their consent and has not been destroyed. Plaintiff and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights. Plaintiff continues to desire to search for health information on Defendant's website. Plaintiff will continue to suffer harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiff would use Defendant's website to search for health information in the future. Due to the continuing threat of injury, Plaintiff and Class Members have no adequate remedy at law, and Plaintiff and Class Members are therefore entitled to injunctive relief.

306.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

### COUNT II—VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT ("CMIA") CIVIL CODE SECTION 56.06

307.    Plaintiff re-alleges and incorporates all preceding paragraphs.

308.    Plaintiff brings this claim on himself of himself and all members of the Saint Agnes Medical Center Class.

309.     Defendant is a provider of health care under CAL. CIVIL CODE. § 56.06, subdivision (a) and (b), because it maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or for the diagnosis, treatment, or management of a medical condition.

310.     Defendant is therefore subject to the requirements of the CMIA and obligated under subdivision (d) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information disclosed to it.

311.     Defendant violated Civil Code section 56.06 because it did not maintain the confidentiality of users' medical information. Instead, Defendant disclosed Plaintiff's and Class Members' medical information to Facebook, Google, and other third parties without consent. This information was intentionally shared with Facebook and Google, whose business is to sell advertisements based on the data that they collect about individuals, including the data Plaintiff and the Class Members shared with Defendant.

312.     Defendant knowingly and willfully, or negligently, disclosed medical information without consent to Facebook, Google, and other third parties for financial gain. Defendant's conduct was knowing and willful as it was aware that Facebook would collect all data inputted while using their website, yet intentionally embedded Meta Pixel anyway.

313.     Accordingly, Plaintiff and Class members are entitled to: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); and (4) reasonable attorney's fees and other litigation costs reasonably incurred.

314.     In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)     Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)     Defendant eroded the essential confidential nature of the doctor-patient relationship; and

1        (c)    Defendant took something of value from Plaintiff and Class Members and

2        derived benefit therefrom without Plaintiff's and Class Members'

3        knowledge or informed consent and without sharing the benefit of such

4        value.

5        315.    Plaintiff and Class Members also seek such other relief as the Court may deem

6    equitable, legal, and proper.

7    **COUNT III—VIOLATION OF CMIA CIVIL CODE § 56.101**

8        316.    Plaintiff re-alleges and incorporates all preceding paragraphs.

9        317.    Plaintiff brings this claim on behalf of himself and all members of the Saint Agnes

10   Medical Center Class.

11       318.    Civil Code § 56.101, subdivision (a) requires that every provider of health care

12   "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information

13   shall do so in a manner that preserves the confidentiality of the information contained therein."

14       319.    Any health care provider who "negligently creates, maintains, preservers, stores,

15   abandons, destroys, or disposes of medical information shall be subject to the remedies and

16   penalties provided under subdivisions (b) and (c) of Section 56.36."

17       320.    Defendant failed to maintain, preserve, and store medical information in a manner

18   that preserves the confidentiality of the information contained therein because it disclosed to

19   Facebook, Google, and other third parties Plaintiff's and Class Members' sensitive medical

20   information without consent, including information concerning their health status, medical

21   diagnoses, treatment, and appointment information, as well as personally identifiable information.

22       321.    Defendant's failure to maintain, preserve, and store medical information in a

23   manner that preserves the confidentiality of the information was, at the least, negligent and

24   violates Civil Code § 56.36 subdivisions (b) and (c).

25

26

27

28   CASE NO.

322.    Accordingly, Plaintiff and Class Members may recover: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); and (4) reasonable attorney's fees and other litigation costs reasonably incurred.

323.    In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)    Defendant eroded the essential confidential nature of the doctor-patient relationship; and

(c)    Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

324.    Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

### COUNT IV—VIOLATION OF CMIA CIVIL CODE § 56.10

325.    Plaintiff re-alleges and incorporates all preceding paragraphs.

326.    Plaintiff brings this claim on behalf of himself and all members of the Saint Agnes Medical Center Class.

327.    Civil Code § 56.10, subdivision (a), prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

328.    Defendant disclosed medical information without first obtaining authorization when it disclosed Plaintiff's and Class Members' sensitive medical information to Facebook, Google, and other third parties without consent, including information concerning their health status, medical diagnoses, treatment, and appointment information, as well as personally

identifiable information. No statutory exception applies. As a result, Defendant violated Civil Code § 56.10, subdivision (a).

329.   Defendant knowingly and willfully, or negligently, disclosed medical information without consent to Facebook for financial gain.

330.   Accordingly, Plaintiff and Class Members may recover: (1) nominal damages of $1,000; (2) actual damages, in an amount to be determined at trial; (3) statutory damages pursuant to 56.36(c); (4) punitive damages pursuant to 56.35; and (5) reasonable attorney's fees and other litigation costs reasonably incurred.

331.   In addition to statutory damages, Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)     Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)     Defendant eroded the essential confidential nature of the doctor-patient relationship; and

(c)     Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

332.   Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

### COUNT V—INVASION OF PRIVACY AND VIOLATION OF THE CALIFORNIA CONSTITUTION, ART. 1, § 1

333.   Plaintiff re-alleges and incorporates all preceding paragraphs.

334.   Plaintiff brings this claim on behalf of himself and all members of the Saint Agnes Medical Center Class.

335.   Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending

CASE NO.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**PAGE 87 EXHIBIT A (CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL)**

1  life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety,

2  happiness, and privacy." California Constitution, Article I, Section 1.

3  336.  To state a claim for invasion of privacy under the California Constitution, a

4  plaintiff must establish (1) a legally protected privacy interest; (2) a reasonable expectation of

5  privacy; and (3) an intrusion so serious in nature, scope, and actual or potential impact as to

6  constitute an egregious breach of social norms.

7  337.  The right to privacy in California's constitution creates a right of action against

8  private and government entities.

9  338.  Plaintiff and Class Members have and continue to have a reasonable expectation

10  of privacy in their personal information, identities, and user data pursuant to Article I, Section I

11  of the California Constitution.

12  339.  Plaintiff and Class Members had a reasonable expectation of privacy under the

13  circumstances, including that: (i) the data collected, used, and disclosed by Defendant included

14  personal, sensitive medical information, decisions, and medical diagnoses; and (ii) Plaintiff and

15  Class Members did not consent or otherwise authorize Defendant to disclose this information to

16  others or to collect and use this private information for their own monetary gain.

17  340.  Given the nature of the Personal Health Information that Defendant disclosed to

18  Facebook, Google, and other third parties, such as patients' names, email addresses, phone

19  numbers, information entered into forms, doctor's names, potential doctor's names, the search

20  terms used to locate doctors (i.e., "Weight loss"), medications, and details about upcoming

21  doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a

22  reasonable person.

23  341.  The disclosure of personally identifiable medical information constitutes an

24  unreasonable, substantial, and serious interference with Plaintiff's and Class Members' rights to

25  privacy.

26

27

28

342.    Plaintiff and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Personal Health Information to Facebook, Google, and other third parties at the time it occurred. Plaintiff and Class Members never agreed that their sensitive medical information could be collected, used, and monetized by Facebook.

343.    Plaintiff and Class Members have suffered irreparable harm and injury, including but not limited to the invasion of their privacy rights. Plaintiff continues to desire to search for health information on Defendant's website. They will continue to suffer irreparable harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiff would use the Defendant's website to search for health information in the future.

344.    Plaintiff and Class Members therefore seek injunctive relief to prevent Defendant from continuing to collect, use, and sell Personal Health Information without consent.

345.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

346.    Plaintiff and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as well as a disgorgement of profits made by Defendant as a result of their intrusions on Plaintiff and Class Members' privacy.

347.    Defendant's breach caused Plaintiff and Class Members, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)    Defendant eroded the essential confidential nature of the doctor-patient relationship;

(c)     Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value;

(d)     Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

(e)     Defendant's actions diminished the value of Plaintiff and Class Members' personal information.

348.     Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

349.     Plaintiff and Class Members seek attorney's fees in accordance with CAL. CIV. PROC. CODE § 1021.5 (West).

350.     Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

### COUNT VI—VIOLATION OF THE COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT ("CDAFA") CAL. PENAL CODE § 502

351.     Plaintiff re-alleges and incorporates all preceding paragraphs.

352.     Plaintiff brings this claim on behalf of himself and all members of the Saint Agnes Medical Center Class.

353.     The California Legislature enacted the Comprehensive Computer Data Access and Fraud Act, CAL. PENAL CODE § 502 ("CDAFA") to "expand the degree of protection . . . from tampering, interference, damage, and unauthorized access to [including the extraction of data from] lawfully created computer data and computer systems," finding and declaring that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . forms of unauthorized access to computers, computer systems, and computer data," and that "protection of

1    the integrity of all types and forms of lawfully created computers, computer systems, and

2    computer data is vital to the protection of the privacy of individuals . . ." CAL. PENAL CODE

3    § 502(a).

4        354.    Plaintiff's and the Class Members' devices on which they accessed the hospital

5    website, including their computers, smart phones, and tablets, constitute computers or "computer

6    systems" within the meaning of CDAFA. *Id.* § 502(b)(5).

7        355.    Defendant violated § 502(c)(1)(B) of CDAFA by knowingly accessing without

8    permission Plaintiff's and Class Members' devices in order to wrongfully obtain and use their

9    personal data, including their sensitive medical information, in violation of Plaintiff's and Class

10   Members' reasonable expectations of privacy in their devices and data.

11       356.    Defendant violated CAL. PENAL CODE § 502(c)(2) by knowingly and without

12   permission accessing, taking, copying, and using Plaintiff's and the Class Members' personally

13   identifiable information, including their sensitive medical information.

14       357.    The computers and mobile devices that Plaintiff and Class Members used when

15   accessing Defendant's website all have and operate "computer services" within the meaning of

16   CDAFA. Defendant violated §§ 502(c)(3) and (7) of CDAFA by knowingly and without

17   permission accessing and using those devices and computer services, and/or causing them to be

18   accessed and used, *inter alia*, in connection with Facebook's wrongful collection of such data.

19       358.    Under § 502(b)(12) of the CDAFA a "Computer contaminant" is defined as "any

20   set of computer instructions that are designed to . . . record, or transmit information within a

21   computer, computer system, or computer network without the intent or permission of the owner

22   of the information." Defendant violated § 502(c)(8) by knowingly and without permission

23   introducing a computer contaminant via Meta Pixel embedded into the hospital website, which

24   intercepted Plaintiff's and the Class Members' private and sensitive medical information.

25       359.    Defendant's breach caused Plaintiff and Class Members, at minimum, the

26   following damages:

27

28   CASE NO.

(a)     Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

(b)     Defendant eroded the essential confidential nature of the doctor-patient relationship; and

(c)     Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without sharing the benefit of such value.

360.     Plaintiff and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

361.     Plaintiff and the Class Members seek compensatory damages in accordance with CAL. PENAL CODE § 502(e)(1), in an amount to be proved at trial, and injunctive or other equitable relief. Plaintiff continues to desire to search for health information on Defendant's website. They will continue to suffer irreparable harm if the website is not redesigned. If the website were redesigned to comply with applicable laws, Plaintiff would use Defendant's website to search for health information in the future.

362.     Plaintiff and Class members are entitled to punitive or exemplary damages pursuant to CAL. PENAL CODE § 502(e)(4) because Defendant's violations were willful and, upon information and belief, Defendant is guilty of oppression, fraud, or malice as defined in CAL. CIVIL CODE § 3294.

363.     Plaintiff and the Class members are also entitled to recover their reasonable attorney's fees under § 502(e)(2).

### COUNT VII—BREACH OF IMPLIED IN FACT CONTRACT

364.     Plaintiff re-alleges and incorporates all preceding paragraphs.

365.     Plaintiff John Doe brings this claim on behalf of himself and all members of the Patient Subclass.

366.    Defendant's "Notice of Privacy Practices" tells patients and prospective patients that Defendant "is committed to protecting medical information about you."[107]  Defendant also assures its patients that their "uses and disclosures of medical information for marketing purposes, and disclosures that constitute a sale of medical information, require your authorization."[108] Defendant further promises that any "uses and disclosures of medical information not covered by this notice or the laws that apply to us will be made only with your written permission."[109]

367.    Defendant solicited and invited Plaintiff and Patient Subclass Members to provide their Private Health Information on its website as part of Defendant's regular business practices. Plaintiff and Patient Subclass Members accepted Defendant's offers and provided their Private Health Information to Defendant as part of acquiring Defendant's medical services. Per its contractual, legal, ethical, and fiduciary duties, Defendant was obligated to take adequate measures to protect Plaintiff's and Patient Subclass Members' Personal Health Information from unauthorized disclosure to third parties such as Facebook. These facts give rise to the inference that Defendant took on obligations outside the plain terms of any express contracts that it may have had with Plaintiff and Patient Subclass Members.

368.    Plaintiff and the Patient Subclass Members entered into valid and enforceable implied contracts with Defendant when they sought medical treatment from Defendant. Specifically, through their course of conduct, Defendant, Plaintiff, and Patient Subclass Members entered into implied contracts for the provision of medical care and treatment, which included an implied agreement for Defendant to retain and protect the privacy of Plaintiff's and Patient Subclass Members' Personal Health Information.

369.    Defendant required and obtained Plaintiff's and Patient Subclass Members' Personal Health Information as part of the physician-patient relationship, evincing an implicit promise by Defendant to act reasonably to protect the confidentiality of Plaintiff's and Patient

---

[107] https://www.samc.com/assets/documents/privacy-and-legal/samc-th-npp-2017-nodate.pdf

[108] https://www.samc.com/assets/documents/privacy-and-legal/samc-th-npp-2017-nodate.pdf

[109] https://www.samc.com/assets/documents/privacy-and-legal/samc-th-npp-2017-nodate.pdf

CASE NO.

Subclass Members' Personal Health Information. Defendant, through its privacy policies, codes of conduct, company security practices, and other conduct, implicitly promised that it would safeguard Plaintiff's and Patient Subclass Members' Personal Health Information in exchange for access to that information and the opportunity to treat Plaintiff and Patient Subclass Members.

370.    Implied in the exchange was a promise by Defendant to ensure that the Personal Health Information of Plaintiff and Patient Subclass Members in its possession would only be used for medical treatment purposes and would not be shared with third parties such as Facebook without the knowledge or consent of Plaintiff and Patient Subclass Members. By asking for and obtaining Plaintiff's and Patient Subclass Members' Personal Health Information, Defendant assented to protecting the confidentiality of that information. Defendant's implicit agreement to safeguard the confidentiality of Plaintiff's and Patient Subclass Members' Personal Health Information was necessary to effectuate the contract between the parties.

371.    Plaintiff and Patient Subclass Members provided their Personal Health Information in reliance on Defendant's implied promise that this information would not be shared with third parties without their consent.

372.    These exchanges constituted an agreement and meeting of the minds between the parties: Plaintiff and Patient Subclass Members would provide their Personal Health Information in exchange for the medical treatment and other benefits provided by Defendant (including the protection of their confidential personal and medical information). A portion of the price of each payment that Plaintiff and the Patient Subclass Members made to Defendant for medical services was intended to ensure the confidentiality of their Personal Health Information.

373.    In entering into such implied contracts, Plaintiff and Patient Subclass Members reasonably believed and expected that Defendant would comply with its promises to protect the confidentiality of their Personal Health Information as well as applicable laws and regulations governing the disclosure of such information and that Defendant would not allow third parties to collect or exploit their communications with Defendant without their consent.

374.    It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiff and Patient Subclass Members would not have disclosed their Personal Health Information to Defendant but for the prospect of Defendant's promise of medical treatment and other benefits. Conversely, Defendant presumably would not have taken Plaintiff and Patient Subclass Members' Personal Health Information if they did not intend to provide them with medical treatment and other benefits.

375.    Defendant was therefore required to reasonably safeguard and protect the Personal Health Information of Plaintiff and Patient Subclass Members from unauthorized disclosure and/or use by third parties.

376.    Plaintiff and Patient Subclass Members accepted Defendant's medical services offer and fully performed their obligations under the implied contract with Defendant by providing their Personal Health Information to Defendant among other obligations. Plaintiff and Patient Subclass Members would not have provided and entrusted their Personal Health Information to Defendant in the absence of their implied contracts with Defendant and would have instead retained the opportunity to control their Personal Health Information for uses other than the benefits offered by Defendant.

377.    Plaintiff and Patient Subclass Members relied on Defendant's implied promises to safeguard their Personal Health Information to their detriment. Defendant breached the implied contracts with Plaintiff and Patient Subclass Members by failing to reasonably safeguard and protect Plaintiff's and Patient Subclass Members' Personal Health Information from disclosure to Facebook.

378.    Defendant's failure to implement adequate measures to protect the Personal Health Information of Plaintiff and Patient Subclass Members and Defendant's intentional disclosure of the same to Facebook violated the purpose of the agreement between the parties: Plaintiff's and Patient Subclass Members' provision of money and Personal Health Information in exchange for medical services and other benefits.

379.    Instead of safeguarding Plaintiff's and Patient Subclass Members' Personal Health Information, Defendant intentionally shared that information with Facebook, thereby breaching the implied contracts it had with Plaintiff and Patient Subclass Members.

380.    Plaintiff and Patient Subclass Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to operate its website free of surreptitious collection and exploitation of communications between the parties. Defendant failed to do so. Plaintiff and Patient Subclass Members would not have sought medical services from Defendant if they had known that Defendant would share their Personal Health Information with Facebook without their knowledge or written consent.

381.    Under the implied contracts, Defendant and/or its affiliated healthcare providers promised and were obligated to: (a) provide healthcare to Plaintiff and Patient Subclass Members; and (b) protect Plaintiff's and the Patient Subclass Members' Personal Health Information provided to obtain such healthcare. In exchange, Plaintiff and Patient Subclass Members agreed to pay money for these services, and to turn over their Personal Health Information through the use of Defendant's websites.

382.    Both the provision of medical services and the protection of Plaintiff and Patient Subclass Members' Private Health Information were material aspects of these implied contracts.

383.    The implied contracts for the provision of medical services—contracts that include the contractual obligations to maintain the privacy of Plaintiff's and Patient Subclass Members' Private Health Information unless they consented—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's published Notice of Privacy Practices.

384.    Defendant's express representations, including, but not limited to, the express representations found in its Privacy Policy, memorialize and embody an implied contractual obligation requiring Defendant to refrain from aiding or allowing third parties to collect Plaintiff's and Patient Subclass Members' Private Health Information without consent. By soliciting and

CASE NO.

1    acquiring Plaintiff's and Patient Subclass Members' Personal Health Information, Defendant

2    assumed an independent duty to handle Plaintiff's and Patient Subclass Members' Personal Health

3    Information with due care and consistent with industry standards to prevent the foreseeable harm

4    that arises from a breach of that duty.

5        385.    Consumers of healthcare value their privacy, the privacy of their dependents, and

6    the ability to keep their Private Health Information associated with obtaining healthcare private.

7    To customers such as Plaintiff and the Patient Subclass Members, healthcare that allows third

8    parties to secretly collect their Private Health Information without consent is fundamentally less

9    useful and less valuable than healthcare that refrains from such practices. Plaintiff and Patient

10   Subclass Members would not have entrusted their Private Health Information to Defendant and

11   entered into these implied contracts with Defendant without an understanding that their Private

12   Health Information would be safeguarded and protected or entrusted their Private Health

13   Information to Defendant in the absence of its implied promise to do so.

14       386.    A meeting of the minds occurred when Plaintiff and the Patient Subclass Members

15   agreed to, and did, provide their Private Health Information to Defendant and/or its affiliated

16   healthcare providers and paid for the provided healthcare in exchange for, amongst other things,

17   (a) the provision of healthcare and medical services and (b) the protection of their Private Health

18   Information.

19       387.    Plaintiff and the Patient Subclass Members performed their obligations under the

20   contract when they paid for their healthcare services and provided their Private Health

21   Information.

22       388.    Defendant materially breached its contractual obligation to protect the nonpublic

23   Private Health Information Defendant gathered when it allowed Facebook to collect and exploit

24   that information without Plaintiff's and Patient Subclass Members' consent.

25       389.    Defendant also materially breached its contractual obligation to protect Plaintiff's

26   and Patient Subclass Members' non-public Personal Health Information when it failed to

27

28   CASE NO.

implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Personal Health Information without consent to third-party advertising companies like Facebook, (2) failed to implement adequate reviews of the software code and java script installed on its websites to ensure that patients' Personal Health Information was not being automatically routed without consent to third-party advertising companies like Facebook, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Personal Health Information shared with third-party advertising companies like Facebook, (4) failed to take other industry-standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to implement internal policies and educational programs to ensure that Defendant's website managers and coders were familiar with the legal regulations governing the disclosure patient Personal Health Information to third parties, and (6) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Personal Health Information to third party advertising companies like Facebook.

390.    As a result of Defendant's failure to fulfill the data-privacy protections promised in these contracts, Plaintiff and Patient Subclass Members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to those described in the contracts. Plaintiff and Patient Subclass Members were therefore damaged in an amount at least equal to the difference in the value of the healthcare services with data privacy they paid for and the healthcare services they received.

391.    As a result of Defendant's material breaches, Plaintiff and Patient Subclass Members were deprived of the benefit of their bargain with Defendant because they spent more on medical services with Defendant than they would have if they had known that Defendant was not providing the reasonable data security and confidentiality of patient communications that Defendant represented that it was providing in its privacy policies. Defendant's failure to honor

CASE NO.

its promises that it would protect the confidentiality of patient communications thus resulted in Plaintiff and Patient Subclass Members overpaying Defendant for the services they received.

392.   The services that Plaintiff and Patient Subclass Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

393.   The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff and Patient Subclass Members' Private Health Information without consent, neither the Plaintiff, the Patient Subclass Members, nor any reasonable person would have purchased healthcare from Defendant and/or their affiliated healthcare providers.

394.   Defendant's conduct in sharing Plaintiff's and Patient Subclass Members' Personal Health Information with Facebook also diminished the sales value of that information. There is a robust market for the type of information that Plaintiff and Patient Subclass Members shared with Defendant (which Defendant then shared with Facebook). Indeed, Facebook itself has offered to pay the public to acquire similar information in the past so that Facebook could use such information for marketing purposes. Plaintiff and Patient Subclass Members were harmed both by the dissemination of their Personal Health Information and by losing the sales value of that information.

395.   As a direct and proximate result of these failures, Plaintiff and the Patient Subclass Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the loss of the benefit of the bargain they had struck with Defendant.

396.   Plaintiff and the Patient Subclass Members are entitled to compensatory and consequential damages suffered as a result.

397.   Plaintiff and Patient Subclass Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such information remains within Defendant's control and because anytime that Plaintiff and/or Patient Subclass Members interact with Defendant's websites to make appointments, search for information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions, they risk further disclosure of their Personal Health Information. Plaintiff and the Patient Subclass Members are therefore also entitled to injunctive relief requiring Defendant to cease all website operations that allow for the third-party capture of Private Health Information.

## COUNT VIII—QUASI-CONTRACT/RESTITUTION/UNJUST ENRICHMENT

398.   Plaintiff re-alleges and incorporates all preceding paragraphs.

399.   Plaintiff John Doe brings this claim on behalf of himself and all members of the Patient Subclass.

400.   Plaintiff John Doe pleads this cause of action in the alternative to Count VII.

401.   "Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is 'quasi-contract.'" *Munoz v. MacMillan* (2011) 195 Cal. App. 4th 648, 661,124 Cal. Rptr. 3d 664; *see also City of Oakland v. Oakland Raiders* (2022) 83 Cal. App. 5th 458, 299 Cal. Rptr. 3d 463, 478.

402.   Plaintiff and Patient Subclass Members personally and directly conferred a benefit on Defendant by paying Defendant for health care services, which included Defendant's obligation to protect Plaintiff's and Class Members' Personal Health Information. Defendant was aware of receiving these payments from Plaintiff and Patient Subclass Members and demanded such payments as a condition of providing treatment.

403.     Plaintiff and Patient Subclass Members also conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Patient Subclass Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from Facebook and other third parties. Defendant had knowledge that Plaintiff and Patient Subclass Members had conferred this benefit on Defendant by interacting with their website, and Defendant intentionally installed the Meta Pixel tool on its website to capture and monetize this benefit conferred by Plaintiff and Patient Subclass Members.

404.     Plaintiff and the Patient Subclass Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to Facebook, Google, and other third parties. The services that Plaintiff and Patient Subclass Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

405.     The medical services that Defendant offers are available from many other health care systems that do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff's and Patient Subclass Members' Private Health Information without consent, neither Plaintiff, the Patient Subclass Members, nor any reasonable person would have purchased healthcare from Defendant and/or its affiliated healthcare providers.

406.     Defendant unjustly retained those benefits at the expense of Plaintiff and Patient Subclass Members because Defendant's conduct damaged Plaintiff and Patient Subclass

1   Members, all without providing any commensurate compensation to Plaintiff and Patient Subclass

2   Members.

3         407.    The benefits that Defendant derived from Plaintiff and Patient Subclass Members

4   rightly belong to Plaintiff and Patient Subclass Members. It would be inequitable under unjust

5   enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it

6   derived from the unfair and unconscionable methods, acts, and trade practices alleged in this

7   Complaint.

8         408.    Defendant should be compelled to disgorge in a common fund for the benefit of

9   Plaintiff and Patient Subclass Members all unlawful or inequitable proceeds that Defendant

10   received, and such other relief as the Court may deem just and proper.

11   **COUNT IX—VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 *ET. SEQ.***

12         409.    Plaintiff re-alleges and incorporates all preceding paragraphs.

13         410.    Plaintiff John Doe brings this claim on behalf of himself and all members of the

14   Patient Subclass.

15         411.    Defendant's business acts and practices are "unlawful" under the Unfair

16   Competition Law, CAL. BUS. & PROF. CODE §§ 17200 *et. seq.* (the "UCL") because, as alleged

17   above, Defendant violated California common law, the California Constitution, and other statutes

18   and causes of action alleged herein.

19         412.    Defendant's business acts and practices are also "unfair" under the UCL.

20   California has a strong public policy of protecting consumers' privacy interests, including

21   consumers' and patients' personal data. Defendant violated this public policy by, among other

22   things, surreptitiously collecting, disclosing and otherwise exploiting Plaintiff and Patient

23   Subclass Members' Personal Health Information by sharing that information with Facebook

24   without Plaintiff's and/or Patient Subclass Members' consent.

25         413.    Defendant's business acts and practices are also "unfair" in that they are immoral,

26   unethical, oppressive, unscrupulous, and/or substantially injurious to patients. The gravity of the

27

28   CASE NO.

harm of Defendant's secretly collecting, disclosing, and otherwise misusing Plaintiff's and Patient Subclass Members' Personal Health Information by bartering it to Facebook in return for access to the Meta Pixel tool is significant, and there is no corresponding benefit resulting from such conduct. Finally, because Plaintiff and Patient Subclass Members were unaware of Defendant's conduct, they could not have avoided the harm.

414.   Defendant's business acts and practices are also "fraudulent" within the meaning of the UCL. Defendant expressly promised Plaintiff and Patient Subclass Members that they were committed to protecting the confidentiality of their Personal Health Information. Defendant also promised that they would never "sell, rent, license, or trade" patients' personally identifying information "to third parties for their own direct marketing use unless we receive your express consent to do so." These promises were false. Defendant regularly shared Plaintiff and Patient Subclass Members' Personal Health Information with Facebook so that Facebook could target Plaintiff and Patient Subclass Members with advertising benefiting Facebook and its business partners.

415.   Defendant's business acts and practices were likely to, and did, deceive members of the public including Plaintiff and Patient Subclass Members into believing their Personal Health Information would be protected from disclosure to Facebook and other third parties.

416.   Defendant's violations were and are willful, deceptive, unfair, and unconscionable.

417.   Had Plaintiff and Patient Subclass Members known that their sensitive medical information would be intercepted, collected, and transmitted to Facebook by Defendant, they would not have used Defendant's services.

418.   Plaintiff and Patient Subclass Members have a property interest in their Personal Health Information. By surreptitiously collecting and otherwise misusing Plaintiff's and Patient Subclass Members' Personal Health Information, Defendant has taken property from Plaintiff and Patient Subclass Members without providing just (or indeed *any*) compensation.

CASE NO.

419.    Plaintiff and Patient Subclass Members have lost money and property as a result of Defendant's conduct in violation of the UCL. Personal Health Information such as the Personal Health Information collected and transmitted to Facebook by Defendant has objective monetary value. Companies are willing to pay for Personal Health Information, like the information unlawfully collected and transmitted by Defendant to Facebook. For example, Pfizer annually pays approximately $12 million to purchase health data from various sources.[110]

420.    Consumers also value their personal health data. According to the annual Financial Trust Index Survey conducted by the University of Chicago's Booth School of Business and Northwestern University's Kellogg School of Management, which interviewed more than 1,000 Americans, 93 percent would not share their health data with a digital platform for free. Half of the survey participants would only share their data for $100,000 or more, and 22 percent would only share their data if they received between $1,000 and $100,000.[111]

421.    By deceptively collecting, using, and sharing Plaintiff's and Patient Subclass Members' Personal Health Information with Facebook, Defendant has taken money or property from Plaintiff and Patient Subclass Members. Accordingly, Plaintiff seeks restitution on behalf of himself and the Patient Subclass.

422.    Plaintiff and Patient Subclass Members also face a real and immediate threat of future injury to the confidentiality of their Personal Health information both because such information remains within Defendant's control and because any time that Plaintiff and/or Patient Subclass Members interact with Defendant's websites to make appointments, search for information about their medical conditions, search for a doctor, or otherwise seek assistance with their medical conditions, they risk further disclosure of their Personal Health Information. Plaintiff also continues to desire to search for health information on Saint Agnes Medical Center's website. They will continue to suffer irreparable harm if the website is not redesigned. If the

---

[110] https://www.scientificamerican.com/article/how-data-brokers-make-money-off-your-medical-records/

[111] https://www.beckershospitalreview.com/healthcare-information-technology/how-much-should-health-data-cost-100k-or-more-according-to-patients.html

CASE NO.

1    website were redesigned to comply with applicable laws, Plaintiff would use the Saint Agnes

2    Medical Center website to search for health information in the future. Plaintiff and the Patient

3    Subclass Members are therefore also entitled to injunctive relief requiring Defendant to cease all

4    website operations that allow for the third-party capture of Private Health Information.

**COUNT IX—VIOLATION OF CAL. CIVIL CODE § 1798.83**

6        423.    Plaintiff re-alleges and incorporates all preceding paragraphs.

7        424.    Plaintiff John Doe brings this claim on behalf of himself and all members of the

8    Patient Subclass.

9        425.    CALIFORNIA CIVIL CODE § 1798.83 requires that "if a business has an established

10   business relationship with a customer and has within the immediately preceding calendar year

11   disclosed personal information" to a third party and "knows or reasonably should know that the

12   third parties used the personal information for the third parties' direct marketing purposes, that

13   business shall" provide in writing to its customers free of charge (1) a list of the categories of

14   personal information provided to third parties and (2) the names and addresses of all third parties

15   who received the customers' personal information during the preceding calendar year. The kinds

16   of "personal information" that the statute expressly protects includes "medical information,"

17   "health insurance information," and any other kind of information that "identifies, relates to,

18   describes, or is capable of being associated with … a particular individual." CAL. CIVIL CODE

19   § 1798.80.

20       426.    Any customer who is injured by a violation of the statute may institute a civil action

21   to recover damages. CAL. CIVIL CODE § 1798.84(b). Additionally, "for a willful, intentional, or

22   reckless violation of Section 1798.83, a customer may recover a civil penalty not to exceed three

23   thousand dollars ($3,000) per violation; otherwise, the customer may recover a civil penalty of up

24   to five hundred dollars ($500) per violation for a violation of Section 1798.83." CAL. CIVIL CODE

25   § 1798.84(c).   Further, any business that violates, proposes to violate, or has violated this statute

26   may be enjoined. CAL. CIVIL CODE § 1798.84(e).

27

28   CASE NO.

CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

427.    Facebook and Google are third party companies engaged in direct marketing.

428.    Defendant failed to disclose to Plaintiff and Patient Subclass Members that it was regularly collecting, transmitting, and sharing their Personal Health Information with Facebook and Google so that Facebook and Google could target them with advertising. Defendant willfully, intentionally, and/or recklessly failed to provide the information and disclosures required by CAL. CIVIL CODE § 1798.83 as part of a scheme to barter Plaintiff's and Patient Subclass Members' Personal Health Information to Facebook in return for access to the Meta Pixel tool.

429.    Plaintiff and Patient Subclass Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Patient Subclass Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from Facebook and other third parties. Defendant had knowledge that Plaintiff and Patient Subclass Members had conferred this benefit on Defendant by interacting with their website, and Defendant intentionally installed the Meta Pixel tool on their website to capture and monetize this benefit conferred by Plaintiff and Patient Subclass Members.

430.    Plaintiff and Patient Subclass Members also conferred a benefit on Defendant by paying Defendant for health care services, which included Defendant's obligation to protect Plaintiff's and Patient Subclass Members' Personal Health Information. Defendant was aware of receiving these payments from Plaintiff and Patient Subclass Members and demanded such payments as a condition of providing treatment.

431.    Plaintiff and the Patient Subclass Members would not have used the Defendant's services, or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to Facebook. The services that Plaintiff and Patient Subclass Members ultimately received in exchange for the monies paid to Defendant were worth quantifiably less than the services that Defendant promised to provide, which included Defendant's promise that any patient communications with Defendant would be treated as

confidential and would never be disclosed to third parties for marketing purposes without the express consent of patients.

432.    The medical services that Defendant offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiff's and Patient Subclass Members' Private Health Information without consent, neither Plaintiff, the Patient Subclass Members, nor any reasonable person would have purchased healthcare from Defendant and/or their affiliated healthcare providers.

433.    Defendant unjustly retained those benefits at the expense of Plaintiff and Patient Subclass Members because Defendant's conduct damaged Plaintiff and Patient Subclass Members, all without providing any commensurate compensation to Plaintiff and Patient Subclass Members.

434.    Plaintiff and Patient Subclass Members were damaged by Defendant's failure to inform them that their every communication and Personal Health Information was being shared with Facebook, resulting in, at minimum, the following damages:

(a)    Sensitive and confidential information that Plaintiff and Patient Subclass Members intended to remain private is no longer private;

(b)    Defendant eroded the essential confidential nature of the doctor-patient relationship; and

(c)    Defendant took something of value from Plaintiff and Patient Subclass Members and derived benefit therefrom without Plaintiff's and Patient Subclass Members' knowledge or informed consent and without sharing the benefit of such value.

435.    Plaintiff also continues to desire to search for health information on Saint Agnes Medical Center's website. He will continue to suffer irreparable harm if Defendant does not make adequate disclosures regarding which third party marketing companies are receiving Plaintiff's

CASE NO.

and Patient Subclass Members' protected health information. Plaintiff and the Patient Subclass Members are therefore also entitled to injunctive relief requiring Defendant to comply with CAL. CIV. CODE § 1798.83.

## VII. DEMAND FOR JURY TRIAL

436.    Plaintiff hereby demands a trial by jury on all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the proposed Class and Subclass respectfully requests that the Court enter an order:

A.    Certifying the Classes and appointing Plaintiff as the Classes' representative;

B.    Appointing the law firms of Caddel & Chapman, Ahmad, Zavitsanos, & Mensing PLLC, and Turke & Strauss, LLP as and as proposed interim class counsel;

C.    Finding that Defendant's conduct was unlawful, as alleged herein;

D.    Awarding such injunctive and other equitable relief as the Court deems just and proper;

E.    Awarding Plaintiff and the Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

F.    Awarding Plaintiff and the Class members pre-judgment and post-judgment interest;

G.    Awarding Plaintiff and the Class members reasonable attorneys' fees, costs, and expenses; and

H.    Granting such other relief as the Court deems just and proper.

CASE NO.

1    Dated: March 3, 2023                     Respectfully submitted,

2                                        By: */s/ Michael A. Caddell*
                                             Michael A. Caddell (SBN 249469)
3                                            mac@caddellchapman.com
                                             Cynthia B. Chapman (SBN 164471)
4                                            cbc@caddellchapman.com
                                             Amy E. Tabor (SBN 297660)
5                                            aet@caddellchapman.com
                                             CADDELL & CHAPMAN
6                                            628 East 9th Street
                                             Houston TX 77007-1722
7                                            Tel.: (713) 751-0400
                                             Fax: (713) 751-0906
8

9                                            Foster C. Johnson (SBN 289055)
                                             David Warden*
10                                           Nathan Campbell*
                                             Ahmad, Zavitsanos, & Mensing, P.C.
11                                           1221 McKinney Street, Suite 3460
                                             Houston TX 77010
12                                           (713) 655-1101
                                             fjohnson@azalaw.com
13                                           dwarden@azalaw.com
                                             ncampbell@azalaw.com
14

15

16                                           Samuel J. Strauss*
                                             Raina C. Borrelli*
17                                           TURKE & STRAUSS LLP
                                             613 Williamson St., Suite 201
18                                           Madison, Wisconsin 53703
                                             Telephone: (608) 237-1775
19                                           Facsimile: (608) 509-4423
                                             sam@turkestrauss.com
20                                           raina@turkestrauss.com

21                                           * Motions for Admission to be filed

22                                           **COUNSEL FOR PLAINTIFF,
                                             INDIVIDUALLY AND ON BEHALF OF ALL
23                                           OTHERS SIMILARLY SITUATED**

24

25

26

27

28
     _____
     CASE NO.
     _____
                  CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**PAGE 109 EXHIBIT A (CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL)**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Michael A. Caddell (SBN 249469) <br> 628 East 9th St., Houston, TX 77007 <br><br> TELEPHONE NO.: (713) 751-0400  FAX NO. *(Optional):* (713) 751-0906 <br> E-MAIL ADDRESS: mac@caddellchapman.com <br> ATTORNEY FOR *(Name):* John Doe | Page 110 of 119 <br><br> E-FILED <br> 3/3/2023 2:12 PM <br> Superior Court of California <br> County of Fresno <br> By: I. Herrera, Deputy |

Case 1:23-at-00388  Document 1  Filed 05/05/23

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  FRESNO
STREET ADDRESS: 1130 O Street
MAILING ADDRESS: 1130 O Street
CITY AND ZIP CODE: Fresno, CA 93721-2220
BRANCH NAME: B.F. Sisk Courthouse

CASE NAME:
John Doe v. Saint Agnes Medical Center

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 23CECG00816 |
|---|---|---|---|---|
| [x] Unlimited <br> (Amount demanded exceeds $25,000) | [ ] Limited <br> (Amount demanded is $25,000 or less) | [ ] Counter  [ ] Joinder <br> Filed with first appearance by defendant <br> (Cal. Rules of Court, rule 3.402) | | JUDGE: <br><br> DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1.  Check one box below for the case type that best describes this case:

| **Auto Tort** | **Contract** | **Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)** |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort** | [ ] Other collections (09) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | **Real Property** | [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41) |
| [ ] Other PI/PD/WD (23) | [ ] Eminent domain/Inverse condemnation (14) | **Enforcement of Judgment** |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | [ ] Enforcement of judgment (20) |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Miscellaneous Civil Complaint** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] RICO (27) |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Fraud (16) | [ ] Residential (32) | **Miscellaneous Civil Petition** |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Partnership and corporate governance (21) |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Other petition *(not specified above)* (43) |
| [x] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2.  This case [x] is  [ ] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
    a. [ ] Large number of separately represented parties  d. [ ] Large number of witnesses
    b. [x] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve  e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
    c. [ ] Substantial amount of documentary evidence  f. [ ] Substantial postjudgment judicial supervision
3.  Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [x] punitive
4.  Number of causes of action *(specify):* 9
5.  This case [x] is  [ ] is not  a class action suit.
6.  If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: March 3, 2023
s/Michael A. Caddell ▶ *Michael A. Caddell*

_____
(TYPE OR PRINT NAME)  (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
*   Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
*   File this cover sheet in addition to any cover sheet required by local court rule.
*   If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
*   Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use <br> Judicial Council of California <br> CM-010 [Rev.September 1, 2021]

**CIVIL CASE COVER SHEET** <br> **PAGE 110 EXHIBIT A (CIVIL CASE COVER SHEET)**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740; <br> Cal. Standards of Judicial Administration, std. 3.10 <br> www.courts.ca.gov

Case 1:23-cr-00239 Document 1 Filed 05/05/23 Page 111 of 119

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one box** for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

## CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
   Asbestos Property Damage
   Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
   Medical Malpractice– Physicians & Surgeons
   Other Professional Health Care Malpractice
Other PI/PD/WD (23)
   Premises Liability (e.g., slip and fall)
   Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
   Intentional Infliction of Emotional Distress
   Negligent Infliction of Emotional Distress
   Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
   Legal Malpractice
   Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
   Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
   Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
   Negligent Breach of Contract/ Warranty
   Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
   Collection Case–Seller Plaintiff
   Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
   Auto Subrogation
   Other Coverage
Other Contract (37)
   Contractual Fraud
   Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
   Writ of Possession of Real Property
   Mortgage Foreclosure
   Quiet Title
   Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
   Writ–Administrative Mandamus
   Writ–Mandamus on Limited Court Case Matter
   Writ–Other Limited Court Case Review
Other Judicial Review (39)
   Review of Health Officer Order
   Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
   Abstract of Judgment (Out of County)
   Confession of Judgment *(non-domestic relations)*
   Sister State Judgment
   Administrative Agency Award *(not unpaid taxes)*
   Petition/Certification of Entry of Judgment on Unpaid Taxes
   Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
   Declaratory Relief Only
   Injunctive Relief Only *(non-harassment)*
   Mechanics Lien
   Other Commercial Complaint Case *(non-tort/non-complex)*
   Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
   Civil Harassment
   Workplace Violence
   Elder/Dependent Adult Abuse
   Election Contest
   Petition for Name Change
   Petition for Relief From Late Claim
   Other Civil Petition

**PAGE 111 EXHIBIT A (CIVIL CASE COVER SHEET)**

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA • COUNTY OF FRESNO**<br>**Civil Unlimited Department,** Central Division<br>1130 "O" Street<br>Fresno, California  93724-0002<br>**(559) 457-1900** | *FOR COURT USE ONLY*<br><br>3/7/2023<br><br>**Filed by Court** |
| TITLE OF CASE:<br><br>**John Doe vs. Saint Agnes Medical Center / COMPLEX / CLASS ACTION** | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE AND ASSIGNMENT OF JUDGE FOR ALL PURPOSES** | CASE NUMBER:<br>**23CECG00816** |

**To All Parties and their Attorneys of Record:**　**Michael A Caddell**
**Caddell & Chapman**
**628 East 9th Street**
**Houston TX  77007**

> This case has been assigned to **Kristi Culver Kapetan,** Judge for **all purposes**.
> All future hearings will be scheduled before this assigned judge, in **Department 502**

You are required to appear at a Case Management Conference on **07/05/2023**  at **3:28 PM** in **Department 502** of the Court located at 1130 "O" Street, **Fresno, California.**

You must comply with the requirements set forth in the Superior Court of Fresno County, Local Rules, Chapter 2.

Failure to appear at the conference may result in imposition of sanctions, waiver of jury trial, or other adverse consequences.

**Defendants:**  Appearance at the Case Management Conference does not excuse you from having to file your response in proper legal form within 30 days after the summons is served on you. Failure to file a response in a timely manner may result in adverse consequences, including a default judgment being entered against you. If you do not have an attorney and wish to retain one, there are attorney referral services, legal aid offices, and private practice attorneys in the Fresno area (most may be found on the internet or the local phone book).

---

**DECLARATION**

I declare under penalty of perjury under the laws of the State of California that I gave a copy of the **Notice of Case Management and Assignment of Judge for All Purposes** to the person who presented this case for filing.

Date:  **3/7/2023**_____　Clerk, by _____ I. Herrera _____, Deputy

I. H

---

CV-48  R07-21 　　　　　　**NOTICE OF CASE MANAGEMENT CONFERENCE AND ASSIGNMENT OF JUDGE**
**FOR ALL PURPOSES**
OPTIONAL

**PAGE 112 EXHIBIT A (NOTICE OF CMC AND ASSIGNMENT OF JUDGE)**

1  Michael A. Caddell (SBN 249469)
mac@caddellchapman.com
2  Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com
3  Amy E. Tabor (SBN 297660)
aet@caddellchapman.com
4  CADDELL & CHAPMAN
628 East 9th Street
5  Houston TX 77007-1722
Tel.: (713) 751-0400
6  Fax: (713) 751-0906

7  Foster C. Johnson (SBN 289055)
fjohnson@azalaw.com
8  David Warden (*pro hac vice forthcoming*)
dwarden@azalaw.com
9  Joseph Ahmad (*pro hac vice forthcoming*)
jahmad@azalaw.com
10  Nathan Campbell (*pro hac vice forthcoming*)
ncampbell@azalaw.com
11  AHMAD, ZAVITSANOS, & MENSING, P.C.
1221 McKinney Street, Suite 3460
12  Houston TX 77010
Tel: (713) 655-1101
13  Fax: (713) 655-0062

14  *Attorneys for Plaintiff*

E-FILED
4/13/2023 1:07 PM
Superior Court of California
County of Fresno
By: I. Herrera, Deputy

** DEFECTIVE PROOF **

15  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

16  **COUNTY OF FRESNO**

17  JOHN DOE, individually and on
behalf of others similarly situated,
18
*Plaintiff*,
19
20  *v.*
21  SAINT AGNES MEDICAL
CENTER,
22
23  *Defendant*.

CASE NO. 23CECG00816

**PROOF OF SERVICE**

24
25     Plaintiff John Doe files the attached Proof of Service regarding service of the summons,
26  complaint, and other documents on defendant Saint Agnes Medical Center.
27
28  CASE NO. 23CECG00816                   – 1 –

1 | Dated: April 13, 2023

Respectfully submitted,

2 | By: /s/ Michael A. Caddell

3 | Michael A. Caddell (SBN 249469)
mac@caddellchapman.com

4 | Cynthia B. Chapman (SBN 164471)
cbc@caddellchapman.com

5 | Amy E. Tabor (SBN 297660)
aet@caddellchapman.com

6 | CADDELL & CHAPMAN

7 | 628 East 9th Street
Houston TX 77007-1722

8 | Tel.: (713) 751-0400
Fax: (713) 751-0906

9 |

10 | Foster C. Johnson (SBN 289055)
David Warden*

11 | Nathan Campbell*
Ahmad, Zavitsanos, & Mensing, P.C.

12 | 1221 McKinney Street, Suite 3460
Houston TX 77010

13 | (713) 655-1101
fjohnson@azalaw.com

14 | dwarden@azalaw.com
ncampbell@azalaw.com

15 |

16 | Samuel J. Strauss*
Raina C. Borrelli*

17 | TURKE & STRAUSS LLP
613 Williamson St., Suite 201

18 | Madison, Wisconsin 53703
Telephone: (608) 237-1775

19 | Facsimile: (608) 509-4423
sam@turkestrauss.com

20 | raina@turkestrauss.com

21 | * Motions for Admission to be filed

22 | *Counsel for Plaintiff, Individually and on Behalf of All Others Similarly Situated*

23 |

24 |

25 |

26 |

27 |

28 |

CASE NO. 23CECG00816 — 2 —

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO**
**FRESNO COUNTY**

| | |
|---|---|
| JOHN DOE, individually and on behalf of others similarly situated | Case No.:23CECG00816 |
| Plaintiff | |
| v. | |
| SAINT AGNES MEDICAL CENTER | |
| Defendant | |

**PROOF OF PERSONAL SERVICE**

That I, Victor Mendez hereby solemnly affirm under penalties of perjury and upon personal knowledge that the contents of the foregoing documents are true and do affirm I am a competent person over 18 years of age and not a party to this action

That on 4/6/2023 at 12:52 PM at CT Corporation System, 330 N Brand Blvd, Ste. 700, Glendale, CA 91203 I served SAINT AGNES MEDICAL CENTER with the following list of documents: SUMMONS; CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL; CIVIL CASE COVER SHEET; NOTICE OF CASE MANAGEMENT CONFERENCE AND ASSIGNMENT OF JUDGE FOR ALL PURPOSES; ALTERNATIVE DISPUTE RESOLUTION INFORMATION PACKET by then and there personally delivering a true and correct copy of the documents into the hands of and leaving with SAINT AGNES MEDICAL CENTER in Los Angeles County.

That the fee for this Service is $ .00

Victor Mendez
Contracted by CLSS Online, Inc.
1250 Glenoaks Boulevard, Suite 188
Glendale, CA 91201
(800) 336-2577

4-13-23

Executed On:



Order #:8457
Their File S55.231

**PAGE 115 EXHIBIT A (PROOF OF SERVICE)**

**POS-010**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Michael A. Caddell  (SBN 249469)<br>Caddell & Chapman<br>628 East 9th St.<br>Houston, TX 77007<br><br>TELEPHONE NO.: (713)751-0400    FAX NO. *(Optional):* (713) 751-0906<br>E-MAIL ADDRESS *(Optional):* mac@caddellchapman.com<br>ATTORNEY FOR *(Name):* John Doe, individually and on behalf of others similarly situated. | *FOR COURT USE ONLY*<br><br><br>E-FILED<br>4/21/2023 2:08 PM<br>Superior Court of California<br>County of Fresno<br>By: S. Garcia, Deputy |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO | |
|---|---|
| STREET ADDRESS: 1130 O Street | |
| MAILING ADDRESS: 1130 O Street | |
| CITY AND ZIP CODE: Fresno, CA 93721-2220 | |
| BRANCH NAME: B.F. Sisk Courthouse | |

| PLAINTIFF/PETITIONER: John Doe, individually and on behalf of others similarly situated | CASE NUMBER:<br>23CECG00816 |
|---|---|
| DEFENDANT/RESPONDENT: Saint Agnes Medical Center | |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☒ summons
   b. ☒ complaint
   c. ☒ Alternative Dispute Resolution (ADR) package
   d. ☒ Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐ cross-complaint
   f. ☒ other *(specify documents):* Notice of Case Management Conference and Assignment of Judge for All Purposes

3. a. Party served *(specify name of party as shown on documents served):*
      Saint Agnes Medical Center
   b. ☒ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
      CT Corporation System (registered agent for service in California)

4. Address where the party was served:
   330 N. Brand Blvd., Ste. 700, Glendale, CA  91203

5. I served the party *(check proper box)*
   a. ☒ **by personal service. I** personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party   (1) on *(date):* April 6, 2023       (2) at *(time):* 12:52 P.M.

   b. ☐ **by substituted service.** On *(date):*             at *(time):*          I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*        from *(city):*         **or** ☐ a declaration of mailing is attached.
      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |

**PAGE 116 EXHIBIT A (PROOF OF SERVICE)**

**POS-010**

| | |
|---|---|
| PLAINTIFF/PETITIONER:  John Doe, individually and on behalf of others similarly situated | CASE NUMBER:  23CECG00816 |
| DEFENDANT/RESPONDENT:  Saint Agnes Medical Center | |

5.  c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1)  on *(date):*               (2)  from *(city):*

    (3)  ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

    (4)  ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:

  a. ☐ as an individual defendant.

  b. ☐ as the person sued under the fictitious name of *(specify):*

  c. ☐ as occupant.

  d. ☒ On behalf of *(specify):*  Saint Agnes Medical Center
    under the following Code of Civil Procedure section:

    ☒ 416.10 (corporation)               ☐ 415.95 (business organization, form unknown)
    ☐ 416.20 (defunct corporation)          ☐ 416.60 (minor)
    ☐ 416.30 (joint stock company/association)  ☐ 416.70 (ward or conservatee)
    ☐ 416.40 (association or partnership)    ☐ 416.90 (authorized person)
    ☐ 416.50 (public entity)               ☐ 415.46 (occupant)
                                  ☐ other:

7.  **Person who served papers**

  a.  Name:  Victor Mendez

  b.  Address:  1250 Glen Oaks Blvd. Ste. 188, Glendale, CA 91201

  c.  Telephone number: (800) 336-2577

  d.  **The fee** for service was: $ 0.00

  e.  I am:

    (1) ☐ not a registered California process server.

    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).

    (3) ☒ a registered California process server:

      (i) ☐ owner   ☐ employee   ☒ independent contractor.
      (ii)  Registration No.:  3428
      (iii) County:    Los Angeles

8.  ☒ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    **or**

9.  ☐ **I am a California sheriff or marshal and I** certify that the foregoing is true and correct.

Date:  4-19-23

Victor Mendez
_____
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

                                          (SIGNATURE)

| | | |
|---|---|---|
| POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Page 2 of 2 |

For your protection and privacy, please press the Clear
This Form button after you have printed the form.   | Print this form |  | Save this form |     | Clear this form |

**PAGE 117 EXHIBIT A (PROOF OF SERVICE)**

## PROOF OF SERVICE

I, Nancy L. Brazil, declare:

I am employed in Los Angeles County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 11601 Wilshire Boulevard, Suite 1400, Los Angeles, CA  90025-0509.  On May 5, 2023, I served a copy of the within document(s):

### DEFENDANT'S NOTICE OF REMOVAL

☑      by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California addressed as set forth below.

☑      by transmitting via electronic mail the document(s) listed above to the e-mail address(es) set forth below on this date and the transmission was reported as complete and without error.

Michael A. Caddell (SBN 249469)      *Attorneys for Plaintiff*
Cynthia B. Chapman (SBN 164471)      JOHN DOE, individually and on behalf
Amy E. Tabor (SBN 297660)      of all others similarly situated
**CADDELL & CHAPMAN**
628 East 9th Street
Houston TX 77007-1722
Telephone:    713.751.0400
Facsimile:    713.751.0906
Emails:    mac@caddellchapman.com
          cbc@caddellchapman.com
          aet@caddellchapman.com

Foster C. Johnson
David Warden
Joseph Ahmad
Nathan Campbell
**AHMAD, ZAVITSANOS, & MENSING, P.C.**
1221 McKinney Street, Suite 3460
Houston TX 77010
Telephone:    713.655.1101
Facsimile:    713.655.0062
Emails:    fjohnson@azalaw.com
          dwarden@azalaw.com
          jahmad@azalaw.com
          ncampbell@azalaw.com

Samuel J. Strauss
Raina C. Borrelli
**TURKE & STRAUSS LLP**
613 Williamson St., Suite 201
Madison, Wisconsin 53703
Telephone:    608.237.1775
Facsimile:    608.509.4423
Emails:    sam@turkestrauss.com
          raina@turkestrauss.com

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

PROOF OF SERVICE

1   I am readily familiar with the firm's practice of collection and processing correspondence

2   for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same

3   day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on

4   motion of the party served, service is presumed invalid if postal cancellation date or postage meter

5   date is more than one day after date of deposit for mailing in affidavit.

6   I declare under penalty of perjury under the laws of the United States of America that the

7   above is true and correct.

8   Executed on May 5, 2023, at Los Angeles, California.

9

10



11   Nancy L. Brazil

Baker & Hostetler llp
Attorneys at Law
Los Angeles

PROOF OF SERVICE